9 A.3d 123

**Bryan SIVELLS**

v.

**STATE of Maryland.**

**No. 1480, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Dec. 2, 2010.

Vidya A. Mirmira (Williams & Connolley LLP, Washington DC, Paul B. DeWolfe, Public Defender, Baltimore, MD), on the brief, for appellant.

Carrie J. Williams (Douglas Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: MATRICCIANI, GRAEFF, and ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

GRAEFF, J.

A jury sitting in the Circuit Court for Baltimore City convicted appellant, Bryan Sivells, of possession of cocaine. The court sentenced appellant to seven years imprisonment.[1]

Appellant presents three questions for our review, which we have rephrased:

1. Was the appellant denied a fair trial by the prosecutor's comments in rebuttal closing argument, where the prosecutor commented on the credibility of the State's witnesses?

2. Did the trial court err in denying appellant's motion to suppress the cocaine found on appellant's person because the State did not have probable cause to arrest?

3. Did the trial court err in admitting expert fingerprint testimony as rebuttal evidence?

For the reasons set forth below, we hold that the prosecutor's statements in closing argument constituted reversible error. Accordingly, we shall reverse the judgment of the circuit court.

---

1. A person convicted of possession of cocaine "is subject to imprisonment not exceeding 4 years." Md.Code (2002), § 5–601(c)(1) of the Criminal Law Article ("C.L."). Here, however, appellant was a repeat offender with a history of drug related offenses, and therefore, he was "subject to . . . a term of imprisonment twice that otherwise authorized." *See* C.L. § 5–905(a)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Suppression Hearing

At approximately 10:45 p.m. on July 30, 2008, Detectives Thomas E. Wilson, III and Isaac Carrington responded to a complaint of narcotics activity at the corner of 20th and Boone Streets in Baltimore City. Detective Wilson, who was accepted as an expert in the "identification, packaging, and sale of narcotics," testified that, after patrolling Boone Street for approximately five minutes, he "observed an unknown black female entering the area." The woman approached an unknown man and asked: "[I]s any ready out[?]" Detective Wilson testified that "ready" was a street term used to refer to crack cocaine. The man directed the woman toward an alley where appellant was standing. The woman approached appellant, spoke briefly to him, and pulled out money. Appellant then reached into his right sock. Based on his training and experience, Detective Wilson believed that a drug transaction was occurring.

At that point, and prior to any distribution of drugs, Detectives Wilson and Carrington approached appellant. Detective Wilson testified that Detective Carrington searched appellant and recovered 13 ziploc bags of cocaine from appellant's right sock.

Detective Carrington then testified. His testimony corroborated that of Detective Wilson.

The State argued that the detectives' observations, coupled with Detective Wilson's expertise in the sale of narcotics, provided sufficient probable cause to arrest appellant, and the ensuing search of appellant was proper as a search incident to a lawful arrest. Defense counsel argued that the drugs should be suppressed, attacking the credibility of the detectives' testimony, stating that the detectives never actually saw any drugs before searching the appellant, and questioning whether the unidentified man or woman actually existed.[2]

---

**2.** Neither the unknown man nor the unknown woman was arrested or charged with a crime. Detective Carrington testified that the police

The trial court denied appellant's motion to suppress, finding that the detectives had probable cause to believe that appellant had drugs in his sock. The court noted that the detectives saw the woman ask for "ready," approach appellant and take her currency out of her purse, and appellant then go for his sock. The court stated that "[u]nseen or unknown objects exchanged for currency constitutes probable cause."

## II.

### Trial Proceedings

On July 9, 2009, trial began. The State's first witness was Hondge Pan, a chemist. Mr. Pan testified that he tested the substance seized from appellant in the ziploc bags, and he determined that it was cocaine. During cross-examination, defense counsel inquired as to whether the ziploc bags had been submitted for fingerprint analysis, and Mr. Pan stated that he did not know, that it was "not my work."

Defense counsel pressed Mr. Pan on his knowledge regarding whether drugs were typically dusted for fingerprints. Counsel inquired about the precautions Mr. Pan took to ensure that his fingerprints would not be on the ziploc bags should a fingerprint analysis be conducted after Mr. Pan analyzed the bags' contents. Appellant's counsel also inquired whether Mr. Pan had seen items submitted for analysis that had fingerprint dust on them. Mr. Pan stated: "Occasionally. Not much." He acknowledged that the black powder could be seen by looking at the submission, and he said: "There's no black powder in this case."

Detective Wilson testified next, and he was accepted as an expert in the "identification, packaging and sale of cocaine within Baltimore City." He testified regarding how cocaine is packaged, explaining that it is packaged in, among other things, ziploc bags. Detective Wilson then explained how a typical narcotics transaction occurs. A drug dealer would

---

stopped the woman and questioned her, but they did not fill out a citizen contact form.

have the drugs on his or her person or in a stash. A person seeking to buy drugs would approach the drug dealer, engage in a brief conversation, give the dealer money, and the dealer would give the buyer drugs.

Detective Wilson then testified, consistent with his testimony at the suppression hearing, regarding the events of July 30, 2008. He also testified that, based on his training and experience, the quantity of cocaine appellant possessed led him to believe that appellant possessed the drugs for the purposes of selling them.

On cross-examination, counsel for appellant challenged the veracity of Detective Wilson's account of events. Counsel asked Detective Wilson about his testimony in another case, where his credibility had been questioned:

[DEFENSE COUNSEL]: Detective Wilson, you had the uncomfortable experience some years ago, 2003, of being, testifying in front of Andre Davis in Federal Court, the conclusion of which, Judge Andre Davis basically declared that he didn't believe your testimony ... Judge Davis declared basically, "I find the (unintelligible) of the Affidavit to be a knowing lie. I also find the use of the term 'in a covert position' to be a knowing lie. I also find the assertion [that] of the unknown subject fled the area on foot to be a knowing lie. Wilson received an anonymous call, I find Detective Wilson's testimony in that regard incredible. The government has not established it. It rejected it. I reject that testimony. I do not find it credible. I don't believe Detective Wilson saw what he claims he saw. I reject that testimony. I don't find it credible...."

"Specifically, I find there's no way that Detective Wilson could have made the observations he claims he made. I've assessed the demeanor of Detective Wilson. I've listened carefully to his testimony and, indeed, I've engaged in pressuring Detective Wilson in an effort not to impeach or undermine the governmen'ts [sic] presentation, but to satisfy in my own mind, as the finder of fact in the suppression hearing, how it could be that a narrative so implausible, and

so implausible and incredibly presented might be accepted by the Court. Frankly, I don't mean this as criticism, but ... the State's Attorney argument today, shed some light," dah-dah-dah-dah-dah.

Do you recall the uncomfortable experience?

Detective Wilson testified that he recalled the case, and counsel for appellant continued with this line of questioning as follows:

[DEFENSE COUNSEL]: The matter resulted in your being called in front of the [Internal Affairs Division] and disciplined and given five days extra training, did it not?

[DETECTIVE WILSON]: It wasn't extra training. It was one day search and seizure training.

[DEFENSE COUNSEL]: Search and seizure. Court's indulgence. I stand corrected, five days loss of leave and search and seizure training from neglect of duty, is that fair to say?

[DETECTIVE WILSON]: That's correct.

Defense counsel then questioned Detective Wilson about his failure to gather evidence in this case to corroborate his account of events. He asked Detective Wilson whether he "could have made this all up."

On redirect, the State asked Detective Wilson to explain the discrepancies in his statements in federal court. With respect to the affidavit that he signed, Detective Wilson explained that he had used incorrect grammar and misspelled words. Additionally, he had stated that an incident occurred in the first week of October, when it actually had occurred on October 9th, and he stated that he took a covert position when he was engaging in on-foot surveillance. Detective Wilson suggested that the "knowing lies" to which Judge Davis referred "could be characterized as misconceptions, misunderstandings." Detective Wilson testified that he did not receive any demotion or reassignment as a result of the 2003 case. With respect to the July 30, 2008, incident in this case, Detective Wilson testified that he was telling the truth, and he had not fabricated his testimony.

On re-cross, counsel for appellant again questioned Detective Wilson regarding Judge Davis' characterization of his affidavit as a "blatant lie," and he questioned whether "grammatical confusion" would result in Detective Wilson losing five days of pay. Detective Wilson acknowledged that he "did lose money. I did lose time."

The State's next witness was Detective Isaac Carrington, who was also accepted as an expert in the "identification, packaging, and the sale of narcotics in Baltimore City." Detective Carrington's testimony with respect to the events leading up to appellant's arrest on July 30, 2008, was consistent with his testimony at the suppression hearing. He also confirmed the chain of custody of the 13 ziploc bags of cocaine recovered from the appellant. The drugs then were admitted into evidence.

On cross-examination, appellant's counsel questioned Detective Carrington about the unknown male and female, noting that they were not arrested and suggesting that they did not exist. After asking Detective Carrington for details about the unknown woman's appearance and inquiring as to why he did not take a picture of her, appellant's counsel stated: "Because she didn't exist so you couldn't stop her if you wanted to[.]" Appellant's counsel also pressed Detective Carrington for more detail about the unknown man's description, referring to him as the "ghost man."

Counsel then questioned Detective Carrington about why he did not request that the ziploc bags be checked for fingerprints. Detective Carrington responded that he did not request fingerprints because he had recovered the ziploc bags from appellant's sock. He subsequently testified that he never requested that drugs be fingerprinted.

On redirect, the State inquired about the fingerprint analysis protocol for seized narcotics. Detective Carrington responded that he typically did not request a fingerprint analysis for seized narcotics because the drugs are usually recovered directly from the dealer, and to the best of his

knowledge, fingerprints cannot be lifted from the packaging in which narcotics are seized.

On recross, appellant's counsel revisited the issue of fingerprint analysis. Counsel asked Detective Carrington whether he knew that "fingerprints can come off of any surface where a fingerprint oil is left on a smooth surface and preserved by good police work." Detective Carrington answered affirmatively, and he confirmed that he had never requested to have a fingerprint analysis conducted on vials or ziploc bags.

The State then addressed the issue again, asking Detective Carrington who had told him that fingerprint analysis generally would not be ordered for drugs seized during narcotics arrests. Detective Carrington responded that he had been so advised by his supervisor and other drug units.

The State then alerted the court and the appellant that it intended to call Ms. Sharon Talmadge, a fingerprint expert, to testify. The prosecutor stated that, because appellant "ha[d] gone so deeply into the fingerprints," the State wanted to explain "why fingerprints would not be found on these types of items." Over appellant's objection, the court ruled that it would permit Ms. Talmadge to testify the next day. The court instructed the appellant to call his witness, who was testifying out of order at appellant's request because of scheduling constraints.[3]

Appellant called Tabina Clanton, his sole witness, to rebut the detectives' testimony that they saw a man, who was sitting on the steps of 700 East 20th Street, direct the unknown woman to appellant. Ms. Clanton testified that there were no steps leading to the home of 700 East 20th Street; the steps led to the house next to 700 East 20th Street. After Ms. Clanton's testimony, the trial recessed for the day.

---

3. Before calling his witness, appellant asked the court whether he should make his "motion," presumably referring to a motion for judgment of acquittal. The court told the appellant not to make the motion because the State had not yet finished its case.

When court reconvened the following day, the State informed the court and appellant that Ms. Elizabeth Pattie would testify instead of Ms. Talmadge. The prosecutor advised that the State was closing its case-in-chief, not having called a fingerprint expert, and that Ms. Pattie would be testifying as a rebuttal witness.

Ms. Pattie was accepted as an expert in the field of latent prints and examination, and she explained how and why fingerprints are left on different objects. She testified about the likelihood of recovering fingerprints from a ziploc bag filled with cocaine, explaining that "over the years our chances have not been very successful for drugs."

The State called two other rebuttal witnesses, Detective Wilson and Detective Kenneth Ramburg, to testify to the location of the stairs outside 700 and 702 East 20th Street. After the rebuttal witnesses testified, the court instructed the jury and proceeded to closing arguments. The jury found the appellant guilty of possession of cocaine but not guilty of possession with the intent to distribute cocaine.

This timely appeal followed.

## DISCUSSION

### I.

### CLOSING ARGUMENT

Appellant's first contention is that "the State's repeated improper vouching of its witnesses" deprived him of a fair trial. He asserts that "the State attempted to convince the jury that the police officers were credible, honest, and honorable." Appellant argues that "[t]he credibility of the State's witnesses was the main issue in [appellant's] trial," and "[w]here the jury's assessment of witness credibility is a critical issue, an error affecting the jury's ability to assess credibility is highly prejudicial."

The State contends that the trial court "correctly denied [appellant's] motion for a new trial based on remarks in the

prosecutor's rebuttal closing, where those remarks were in direct response to defense counsel's repeated insistence that the State's witnesses were liars who planted evidence on [appellant]." It argues that, "[a]fter throwing open the door on the issue of the officers' personal integrity and honor," appellant "cannot now complain that the prosecutor walked through that door in rebuttal."

■ An attorney has "great leeway in presenting closing arguments to the jury." *Degren v. State,* 352 Md. 400, 429, 722 A.2d 887 (1999). The Court of Appeals has explained:

[I]t is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. . . . Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the prosecution produces.

*Mitchell v. State,* 408 Md. 368, 380, 969 A.2d 989 (2009) (quoting *Wilhelm v. State,* 272 Md. 404, 412, 326 A.2d 707 (1974)). *Accord Clarke v. State,* 97 Md.App. 425, 431, 630 A.2d 252 (1993) (" '[C]losing argument is a robust forensic forum wherein its practitioners are afforded a wide range for expression.' ") (quoting *Davis v. State,* 93 Md.App. 89, 124, 611 A.2d 1008 (1992)).

■ Despite the leeway afforded to counsel in closing argument, "a defendant's right to a fair trial must be protected." *Lee v. State,* 405 Md. 148, 164, 950 A.2d 125 (2008). Although a prosecutor is entitled to " 'strike hard blows, he is

not at liberty to strike foul ones.' " *United States v. Young,* 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

The determination whether counsel's "remarks in closing were improper and prejudicial, or simply a permissible rhetorical flourish, is within the sound discretion of the trial court to decide." *Jones–Harris v. State,* 179 Md.App. 72, 105, 943 A.2d 1272, *cert. denied,* 405 Md. 64, 949 A.2d 652 (2008). An appellate court generally will not reverse the trial court "unless that court clearly abused the exercise of its discretion and prejudiced the accused." *Degren,* 352 Md. at 431, 722 A.2d 887.

As explained in more detail below, analysis of appellant's contention requires several steps. Initially, we must assess whether the prosecutor's comments, standing alone, were improper. If so, we assess whether, in light of the argument made by defense counsel, the prosecutor's comments were a reasonable response pursuant to the "opened door" doctrine or the invited response doctrine. If not, we must determine whether reversal is required because, under the totality of the circumstances, the comments were likely to have improperly influenced the verdict.

## A. Arguments of Counsel Below

Appellant's defense was that the detectives were not credible. In his opening statement, defense counsel stated:

Now, I'm going to suggest to you quite frankly that what I believe they are doing is making up two people who don't exist. There was no woman. There was no man. They [are] coming in here with an excuse pulled out of thin air for why they drove up on somebody, shook them down, maybe found something or maybe not because I wasn't there. But once you've heard the testimony of these two police officers, you're going to be saying to yourself I can't believe this, I can't believe that, where do I draw the line on what to believe[?]

During closing argument, defense counsel continued with the theme that the officers were not credible, and he repeatedly accused the detectives of lying. Counsel stated:

> To base anything on, in this case to come up with any kind of conviction you have to be able to stand on Det. Wilson's script and say I believe it, I believe it. I think, frankly, it's almost insulting to ask you to believe half of it, let alone the whole thing. It's just about the most preposterous thing that we've spent time listening to in a court of law in Baltimore City in a long time.

> \* \* \*

> He didn't see anybody, ghost male talking to ghost female. Or maybe they're just hearing voices since now we know the steps that he's imagining are, whoa, fifteen more feet away than he ever suspected they were.

> \* \* \*

> [Appellant] just stood up, or he just started walking northbound, or maybe some police car with two guys in it says there's nothing going on here, let's drive up and get that guy over there by that alley. Whoa, buddy, whoa, what's up? What's up? Oh, we're just checking you out. Got anything in your pockets here? What really happened? What really happened?

> \* \* \*

> Supposedly, they went into this woman citizen's, if she exists, pocketbook. Ladies, a police officer is going into your pocketbook and you might not complain? That is what the [citizen contact] form is for. To protect these officers. They didn't do it because she didn't exist. The whole thing is just pulled out of thin air. This is most bazaar [sic].

> \* \* \*

> Ladies and gentlemen, and I don't, honestly, I don't do this in mean spirit, but if there was ever a guy who had ample notice, his credibility is suspect. It's this Ofcr. Wilson. This is a man who was chewed out in almost unheard of fashion by a federal judge five years ago, fined,

fined in punishment for five days leave, which he tells us is $200 a day. A $1,000 fine. Who among us would have a $1,000 fine from our employer and not, not start dotting every I, crossing every T, minding every P, Q, and every other letter. You just do it because that's as close as you get to being fired.

*　　*　　*

Ladies and gentlemen, there is no explanation for Det. Wilson's comments. There is no explanation for his false testimony. The only thing you're going to find in here is line after line of one judge and one attorney excruciatingly agitated. Look up in the index, you don['t] have to read the whole thing unless you want to, but if you want to, go ahead. Look up in the index. Look under words incredible, incredibly, false, falsities, incorrect, incompetent, lie or lies, implausible, misstated, misstatements, mistake, misunderstand, negligent, perjury, offensive, shocking, worst fumbling, bumbling investigation, blatant, wrong, pretext, nonanswer, inexact, in attention, improper, inarguable, inappropriate, insulting.

I take no pleasure out of this. This should be a lesson somebody learned and nobody has to visit it again because we don't have slap-dash, half-baked, imaginary witnesses and incredible evidence brought before twelve people, citizens, thirteen, pardon, madam. Thirteen people spending three days listening to nothing.

This is insulting. This is fumbling and bumbling. Not only a five day loss of money, a $1,000 fine, sent back for remedial training. The first thing, smart thing I heard. I've been marking my P's and Q's or something to that effect after that. Well, well enough. It's possible that this was just a really bad day in this officer's life where everything that he'd gotten done right and everything was going smoothly and well and it just, it just, the stars were not aligned, everything was going wrong. (inaudible) maybe there's reasons and excuses for it. But there's no reason

and no excuse for a prosecution based on it and there's no basis for a conviction on it.

\* \* \*

This [sic] thirteen ziplocks [sic] of cocaine. We know they're cocaine because of Mr. Pan. We know there's thirteen because we can count. We don't have to take anybody's word. There's [sic] thirteen. And if you doubt this, ask to see the drugs, have it cut open right here on the counter and lay them out on the counter. There should be thirteen. We haven't done that, so there might not be. But, there probably are. Let's assume there's thirteen. That's about all we have. And Mr. Sivells got arrested, we don't doubt that. That's the detail that brings us here. Mr. Sivells was arrested and accused of this.

But everything else, whether these drugs were found in an alley, whether he threw a Kleenex (inaudible), here' a bag with thirteen pills, maybe he threw this. Got a gun? No, well, then these drugs are yours. Well, they're not mine. What happened? We could have cameras, we could have tape recorders going on. There's all kinds of things we could do if we want to do this job right. Nobody's asking for CSI, but give us something. Instead he's just saying believe, believe a man who has already lied to us.

\* \* \*

I mean, I've seen some lame prosecutions. I've seen some thin stuff going to the juries. This is about as thin as it ever gets. Trust me, you won't come to court and be a juror and see a case this lame again. I sure hope not. Thinner than thin.

In its rebuttal closing, the State addressed defense counsel's remarks regarding Detective Wilson's credibility. The prosecutor stated:

Talking about Det. Wilson. Let's talk about him for a minute. We're talking about a long time veteran of the Police Department who came in here and sat here in front of all of you so that you could judge his demeanor, you could judge his behavior, the twelve, thirteen of you. You're the

triers of fact in this case. Not something that happened back in 2003, this case, here today. Notice how the defense spoke more about that case than they did their own case.

Appellant objected and asked to approach the bench. The court overruled the objection and denied appellant's request. The State continued:

Det. Wilson sat in front of you for almost three hours being torn apart, not once did he get angry. Not once did he loose [sic] his calm, not once did he avoid the question. He answered each question the best that he could. It doesn't sound like someone that's ashamed or should be hiding or embarrassed. And he shouldn't be.

The errors that he committed back in that case, its semantics. October 9, the first week of October strike one. And "s" on complaints, so he made a grammatical error. Oh, strike number two, that's a lie. Come on.

Not everybody is blessed with the same education as Judge Davis and [appellant's attorney]. He made some mistakes and he admitted to them. That is honorable, to stand here and admit that. But we're forgetting other people testified. You never once heard the defense bring up Det. Carrington. Shoot he was probably hoping you all would forget about him. Whole other testimony, whole other officer sitting here telling you what happened that night. And not once was his credibility brought at issue, not one time. That's why, oh, hopefully they'll forget about that.

\* \* \*

Would the officers love to have cameras at their disposal and all kinds of high technology? I bet they would because then they wouldn't have to sit there and take that abuse for several hours. But the fact remains is they're doing the best they can with what they have to work with and since when was someone's word not good enough. Especially two veterans who have a lot to loose [sic] by making things up, pensions, credibility, livelihood. Everything to loose [sic] and nothing to gain. Not one thing to gain by it. There's

enough legitimate crime going on in this city that officers don't have to—

Counsel for appellant objected, arguing that the State was vouching for its witnesses. The court overruled the objection.

The State continued its rebuttal, arguing that the number of ziploc bags recovered from the appellant, 13, indicated an intent to distribute. The prosecution then returned to the topic of the detectives' credibility, arguing that "[t]hose officers are running towards it when the rest of us are running away from it. What they do is honorable." The court again overruled the "[o]bjection to vouching," and the State continued: "You've had the ability to judge their demeanor. They are honorable men."

At that point, the court advised the jury that the prosecutor's "opinion is not evidence in this case. However, [the State] is permitted to draw an inference as to how you should think rather than how she thinks. You may continue."

The State continued: "Thank you, Your Honor. And two honorable men, doing their jobs, saw Mr. Sivells about to sell a female buyer drugs." The prosecutor subsequently stated: "[The Detectives] are honorable and they told the truth." Counsel for appellant objected again, and the court advised the jury: "Again, the State [is] sounding like its [sic] expressing its own opinion, which its [sic] not permitted to do. Please accept that as an invitation to draw an inference."

After the jury left the courtroom, the court stated: "All right, [counsel], there was a time in closing argument when you asked to approach the bench. I didn't think the issue was momentous enough so I didn't honor your request. Anything you want to say, say it now." Appellant's counsel responded: "I was objecting to vouching, Your Honor and what initially seemed to be some burden shifting. It didn't go very far." The court disposed of the burden shifting issue and then read into the record a series of Maryland cases pertaining to vouching in closing arguments. The court then said:

Okay. So I made it clear to the jury that what sounded like vouching was just the effort to try to get them to draw a

particular inference and told them that the petitioners, the prosecutor's opinion was not relevant and it shouldn't be inferred, what she said, that she was expressing her own opinion. And then I warned [the State] don't let it appear to be [State's] opinion.

After the verdict, appellant filed a motion for a new trial, arguing that the State's comments during closing argument deprived him of a fair trial. The State argued that no vouching occurred, stating that the prosecutor "spoke in generalities, not in specifics and the State made no statements based on any sort of personal knowledge but rather only made statements based on the evidence ... and opposing counsel's comments in opposing counsel[']s closing argument." The State also argued that the court's contemporaneous curative instructions rendered any error harmless.

The court denied appellant's motion, noting that the "voir dire and the instructions" informed the jury that police officers should not be afforded "greater credibility than anybody else," and that it expressly explained to the jury that the State was not permitted to offer its opinion of the officers, but that the State was merely asking them to draw an inference as to the Detectives' credibility. The court stated that the prosecutor's "interjection of her personal opinion of the officer's credibility was inartful and that she meant to say [the jury] should draw that inference."

### B. Prosecutorial Vouching for Credibility

The first step in our analysis is to determine whether the prosecutor's statements, standing alone, were improper. The Court of Appeals has made clear that it "infring[es] on a defendant's right to a fair trial ... when a prosecutor 'vouches' for (or against) the credibility of a witness" in its closing argument. *Spain v. State*, 386 Md. 145, 153, 872 A.2d 25 (2005). *Accord Donaldson v. State*, 416 Md. 467, 489, 7 A.3d 84 (2010). "Vouching typically occurs when a prosecutor 'places the prestige of the government behind a witness through personal assurances of the witness's veracity ... or suggests that information not presented to the jury supports the witness's testimony.' " *Spain*, 386 Md. at 153, 872 A.2d 25

(quoting *United States v. Daas,* 198 F.3d 1167, 1178 (9th Cir.1999)).

The United States Supreme Court has explained the problems associated with prosecutorial vouching as follows:

The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Young,* 470 U.S. at 18–19, 105 S.Ct. 1038.

The rule against vouching does not preclude a prosecutor from addressing the credibility of witnesses in its closing argument. The credibility of witnesses in a criminal trial often is, as it was in this case, a critical issue for the jury to consider. Thus, as the Court of Appeals has recognized, " 'where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness is based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching.' " *Spain,* 386 Md. at 155, 872 A.2d 25 (quoting *United States v. Walker,* 155 F.3d 180, 187 (3rd Cir.1998)).

Appellant points to several statements to support his argument that the prosecutor in this case engaged in improper vouching:

1. The State argued to the jury that the police officers would risk losing their pensions and jobs if they gave false testimony: "[S]ince when was someone's word not good enough. Especially two veterans who have a lot to loose [sic] by making things up, pensions, credibility, livelihood."

2. The State argued to the jury that the police officers are "honorable men" because of what they do: "Those officers

are running towards it when the rest of us are running away from it. What they do is honorable.... They are honorable men."

3. The State argued to the jury that the police officers "are honorable and they told the truth."

The first of these comments is similar to comments in other cases that the Court of Appeals has found improper. In *Spain*, the prosecutor argued that the State's police witness "had a motive to testify truthfully because to testify falsely would expose him to the penalties of perjury and lead to adverse consequences to his career as a police officer." 386 Md. at 154, 872 A.2d 25. The Court of Appeals held that this argument "transcended the boundaries of proper argument," noting that the State had failed to introduce any evidence that the officer would lose benefits for providing perjured testimony. *Id.* The Court further explained:

Even if evidence had been admitted from which it could be inferred that a police officer would face serious employment consequences as a result of testifying falsely, we nonetheless would conclude that the prosecutor's comments during closing argument constituted improper vouching because they also implied improperly that the witness's status as a police officer entitled him to greater credibility in the jury's eyes than any other category of witness about which the same might have been argued. Although the State is free to highlight the incentive, or lack of incentive, of a witness to testify truthfully, courts consistently have held that it is improper to argue that a police officer may be deemed more credible simply because he or she is a police officer.

*Id.* at 157, 872 A.2d 25.

Similarly, in *Donaldson, supra,* 416 Md. at 490, 7 A.3d 84, the prosecutor argued in rebuttal closing argument that the police detectives would not lie because "they want to keep their jobs." The Court of Appeals held that, because there was no evidence supporting the argument that the police might lose their jobs if they lied, the prosecutor's statement was improper. *Id.* at 492–93, 7 A.3d 84.

Here, as in *Spain* and *Donaldson,* there was no evidence to support the prosecutor's statement that the police would lose their pensions or their livelihood if they "made things up." Accordingly, this argument was improper.

In addition to arguing that the police had "a lot to loose [sic] by making things up, pensions, credibility, livelihood," the prosecutor repeatedly referred to Detectives Wilson and Carrington as "honorable men," and she specifically asserted that "they told the truth." Although a single reference to police work as "honorable" might not be impermissible, the repeated references to the officers as "honorable men," and the ultimate statement that "they told the truth," crossed the line. The prosecutor's comments were not tied to the evidence in the case. Rather, as the trial court found, the prosecutor was expressing her personal opinion.[4] Because the comments were not tied to the evidence presented, the comments violated the rule against vouching and were improper. *See United States v. Molina–Guevara,* 96 F.3d 698, 704–05 (1996) (prosecutor's statement assuring the jury that its witness " 'did not lie to you' " suggested that the prosecutor "knew more than the jury had heard and that it should be willing to trust the government's judgment," and therefore, "violated our rule against vouching").

### C. Propriety of Prosecutorial Vouching in Response to Defense Argument

In *Spain,* the Court of Appeals suggested that, although prosecutorial vouching was improper standing alone, it might

---

4. After defense counsel's third objection, the court advised the jury: "Um, [the prosecutor's] opinion is not evidence in this case. However, she's permitted to draw an inference as to how you should think rather than how she thinks. You may continue."

The prosecutor continued with her closing, again noting that the detectives "were honorable and they told the truth." Defense counsel again objected, and the court instructed the jury, "Again, the State [is] sounding like its [sic] expressing it's own opinion, which its [sic] not permitted to do. Please accept that as an invitation to draw an inference."

be permissible in response to a defense attack on the credibility of a State witness. 386 Md. at 157 n. 7, 872 A.2d 25 ("We reserve for another day whether comments such as those made in this case would be allowed under the 'invited response doctrine' as a response to a direct and specific attack on a police officer witness's veracity."). The State asserts that "another day" is here, and this issue must be resolved in this case. It points to appellant's recurring theme throughout the trial, including defense counsel's opening statement, cross-examination, and closing argument, that specifically attacked the detectives' veracity.[5] The State argues that, based on this defense, the prosecution's comments in the case were proper pursuant to the "invited response" doctrine, or alternatively, pursuant to the "opened door" doctrine.

### 1. Opened Door Doctrine

The State contends that the prosecutor's comments were proper pursuant to the "opened door" doctrine, alleging that the prosecutor was "meet[ing] fire with fire" after defense counsel "opened the door to the issue of the officers' honesty and personal integrity" in his "over-the top and improper closing argument." It argues that the prosecutor properly "responded to defense counsel's repeated cry that the officers are liars by countering that they are honorable people who were telling the truth."

Appellant contends that the State's comments were not permissible under the "opened door" doctrine. He argues that the State misstates the scope of the doctrine, and that the State's interpretation would "result in the State being able to

---

5. As indicated, in his opening statement, defense counsel suggested that the detectives were "making up two people who don't exist," and that they had an excuse "pulled out of thin air for why they drove up on somebody, [and] shook them down." During cross-examination of the detectives, counsel repeatedly implied that they fabricated their testimony. In closing argument, counsel repeatedly referred to the unknown man and woman as "ghost male" and "ghost female," stated that the Detective's testimony was "pulled out of thin air," and repeatedly referred to the federal court's finding that Detective Wilson's assertions in a different case were not credible.

engage in impermissible vouching every time a defendant challenges the credibly and veracity of the State's witness."

"The 'opened door' doctrine is based on principles of fairness and permits a party to introduce evidence that otherwise might not be admissible in order to respond to certain evidence put forth by opposing counsel." *Mitchell*, 408 Md. at 388, 969 A.2d 989. *Accord Donaldson*, 416 Md. at 492–93, 7 A.3d 84. Both this Court and the Court of Appeals have applied this doctrine to closing argument. *See, e.g., Mitchell*, 408 Md. at 388, 969 A.2d 989; *Booze v. State*, 111 Md.App. 208, 224, 681 A.2d 534 (1996), *rev'd on other grounds*, 347 Md. 51, 698 A.2d 1087 (1997).

The opened door doctrine permits the admission of otherwise irrelevant evidence that has become relevant in response to the presentation of the other side's case. As the Court of Appeals has explained:

"Opening the door" is a rule of expanded relevancy; it allows the admission of evidence that is competent, but otherwise irrelevant, in order to respond to evidence introduced by the opposing party during its direct examination. Whether the opponent's evidence was admissible evidence that injected an issue into the case or inadmissible evidence that the court admitted over objection, once the "door has been opened" a party must, in fairness, be allowed to respond to that evidence.

*Conyers v. State*, 345 Md. 525, 545, 693 A.2d 781 (1997) (citations omitted). *Accord Mitchell*, 408 Md. at 388, 969 A.2d 989. *See also* 5 LYNN McLAIN, MARYLAND EVIDENCE § 103:13(c)(i) (describing the opened door doctrine as permitting evidence "that previously would have been irrelevant, but has become relevant").

The opened door doctrine, however, is limited to " 'evidence that is competent, but otherwise irrelevant.' " *Grier v. State*, 351 Md. 241, 260, 718 A.2d 211 (1998) (quoting *Conyers*, 345 Md. at 545, 693 A.2d 781). The doctrine does not permit the admission of evidence that is incompetent, *i.e.*, evidence that is "inadmissible for reasons other than relevan-

cy." *Id.* at 261, 718 A.2d 211. Thus, in *Grier,* evidence of post-arrest silence, which "was incompetent, not merely irrelevant;" was not admissible under the "opening the door" doctrine. *Id.* *Accord Clark v. State,* 332 Md. 77, 88 n. 2, 629 A.2d 1239 (1993) (incompetent hearsay evidence inadmissible).

Here, as discussed, *supra,* the prosecutor's comments constituted inadmissible vouching. As such, the comments were not merely irrelevant, they were incompetent. Accordingly, the comments were not permissible pursuant to the opened door doctrine.

### 2. Invited Response Doctrine

We turn next to the State's argument that the comments were proper pursuant to the "invited response doctrine." The Court of Appeals has described the invited response doctrine as involving "a prosecutorial argument . . . made in reasonable response to improper attacks by defense counsel." *Lee,* 405 Md. at 163, 950 A.2d 125 (quoting *Spain,* 386 Md. at 157 n. 7, 872 A.2d 25).

There are two important points to remember about the invited response doctrine. First, analysis pursuant to this doctrine is appropriate "only when defense counsel first makes an improper argument." *Mitchell,* 408 Md. at 382, 969 A.2d 989. *Accord Lee,* 405 Md. at 169, 950 A.2d 125; *James v. State,* 191 Md.App. 233, 259, 991 A.2d 122, *cert. denied,* 415 Md. 338, 1 A.3d 468 (2010). *See also Marshall v. State,* 415 Md. 248, 267, 999 A.2d 1029 (2010) (defense counsel's argument was "not improper, or, at the very least, not sufficiently improper to justify the prosecutor's comments" under the invited response doctrine).

Second, the invited response doctrine does not condone an improper argument by the prosecutor when it is in response to an improper argument by the defense. Rather, it merely provides that, in the context of the arguments as a whole, reversal is not required.

The United States Supreme Court has made clear that the invited response doctrine "should not be read as

suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process." *Young,* 470 U.S. at 12, 105 S.Ct. 1038. *Accord Lee,* 405 Md. at 169, 950 A.2d 125. The Court noted that "two improper arguments—two apparent wrongs—do not make for a right result." *Young,* 470 U.S at 11, 105 S.Ct. 1038. The "invited response" doctrine does not give the prosecutor "license to make otherwise improper arguments," but rather, it looks to "whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id.* at 12, 105 S.Ct. 1038. "[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* at 12–13, 105 S.Ct. 1038. *Accord Mitchell,* 408 Md. at 382, 969 A.2d 989. The " 'unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial.' " *Lee,* 405 Md. at 163–64, 950 A.2d 125 (quoting *Spain,* 386 Md. at 157 n. 7, 872 A.2d 25).

 Thus, with respect to the question left open in *Spain,* whether prosecutorial vouching is permissible under the invited response doctrine if it is in response to a defense attack on the credibility of a State witness, we hold that the answer is no. Prosecutors must recognize that, due to their "role as both advocate and minister of justice," *Walker v. State,* 373 Md. 360, 394–95, 818 A.2d 1078 (2003), they maintain a unique role in the criminal justice system, and they are held to a higher standard of conduct than other lawyers. They are never *justified* in engaging in improper vouching, even in response to an improper argument by defense counsel. If, however, in the heat of the trial, the prosecutor does make an improper argument, the invited response doctrine permits the court to consider whether, in context, the prosecutor's response to the defense impropriety merely balanced the unfair prejudice, such that reversal is not required.[6]

---

**6.** By stating that a prosecutor is not justified in responding to a defense attack on the credibility of a State's witness by vouching for the

With this backdrop in mind, we turn to the first inquiry, whether defense counsel made an improper argument that invoked the invited response doctrine. In *Mitchell*, the Court of Appeals stated that an improper argument includes one that "invite[s] the jury to draw inferences from information that was not admitted at trial." 408 Md. at 382, 969 A.2d 989 (quoting *Lee*, 405 Md. at 166, 950 A.2d 125).

In this case, defense counsel relentlessly attacked the credibility of the officers' testimony. That, however, is not necessarily improper. The Court of Appeals has made clear that, during opening and closing arguments, "it is common and permissible generally for the prosecutor and defense counsel to comment on, or attack, the credibility of the witnesses presented." *Spain*, 386 Md. at 154, 872 A.2d 25. The key issue is whether the attack on the credibility of the officers was based on inferences to be drawn from the evidence. *See Washington v. State*, 180 Md.App. 458, 472, 951 A.2d 885 (2008) (argument is not improper if the statements can be construed as comments "fairly deducible from the evidence," even if " 'the inferences discussed are illogical and erroneous' ") (quoting *Wilhelm v. State*, 272 Md. 404, 412, 326 A.2d 707 (1974)). In *United States v. Weatherspoon*, 410 F.3d 1142, 1148 (9th Cir.2005), the United States Court of Appeals for the Ninth Circuit held that "attacks on the credibility of a ... witness are legitimate tools of advocacy and do not, standing alone, trigger the 'invited response' rule," particularly when

credibility of the witness, we are not suggesting that the prosecutor take no action in response to improper defense argument. In *United States v. Young*, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court stated that the appropriate response of a prosecutor to an improper defense argument is to object to the argument and request a curative instruction to the jury. Moreover, the prosecutor properly can respond to an attack on the credibility of a State witness by noting how the evidence supports the witness's credibility. *See State v. Pennington*, 115 N.M. 372, 851 P.2d 494, 504 (App.1993) (although the prosecutor clearly can respond to accusations by defense counsel that a State witness is lying, it can do so, not by vouching, but "by pointing to the evidence supporting the witness's credibility"). The prosecutor did that here by pointing to Detective Wilson's demeanor on the stand and Detective Carrington's corroborating testimony.

"the defense attacks were grounded in inferences from the evidence rather than defense counsel's personal assurances."

Here, defense counsel's comments attacking the credibility of Detectives Wilson and Carrington were, for the most part, based on inferences to be drawn from the evidence presented, or not presented, at trial. Defense counsel's argument that the jury should not credit the testimony of the detectives had two primary bases: (1) the lack of evidence corroborating their testimony; and (2) the federal court's finding that Detective Wilson previously had given testimony that was not credible. During cross-examination of the detectives, defense counsel elicited testimony that, in violation of department policy, they failed to complete a citizen contact form after speaking with the unknown man and the unknown woman. Counsel elicited evidence that the detectives did not take any photographs of the individuals, nor were they able to provide a detailed physical description of the man and woman. Counsel argued that the only evidence that the man and woman existed, and that the drug transaction occurred, was the testimony of the detectives, and he asserted that the jury could infer from the absence of corroborative evidence that the detectives did not collect such evidence because it did not exist. Because defense counsel's comments in this regard had an evidentiary basis, they were not improper. *See James,* 191 Md.App. at 259, 991 A.2d 122 (" '[I]t is within the scope of permissible argument for counsel to draw inferences from the evidence admitted at trial, which includes the ability to comment on the absence of such evidence.' ") (quoting *Mitchell,* 408 Md. at 383–84, 969 A.2d 989).

Defense counsel also suggested that Detective Wilson was not a credible witness based on Judge Davis' finding in a previous case that the detective's statements were "incredible." These comments also were tied to the evidence presented, and they were not improper. The defense comments on the credibility of the officers did not trigger the invited response doctrine.

██ At oral argument, when pressed regarding what statements made by defense counsel were improper, the State pointed to the following statement in closing argument:

> I mean, I've seen some lame prosecutions. I've seen some thin stuff going to the juries. This is about as thin as it ever gets. Trust me, you won't come to court and be a juror and see a case this lame again. I sure hope not. Thinner than thin.

This statement, to the extent that it referred to defense counsel's experience in other cases, was a reference to facts not in evidence, and it was improper. *See State v. Cortez,* 101 Ariz. 214, 418 P.2d 370, 371 (1966) (defense counsel's comment, that " '[t]his is probably the weakest case, and maybe the poorest job of police work I have seen in a long time,' " was improper).[7] Defense counsel's statement in this regard invoked the invited response doctrine.

 As indicated, the invited response doctrine provides that reversal of a defendant's conviction is not warranted if the prosecutor's response, although improper, is a "reasonable response" to defense counsel's remarks, *Lee,* 405 Md. at 163, 950 A.2d 125. Such a response is one that does "no more than respond substantially in order to 'right the scale.' " *Young,* 470 U.S. at 13, 105 S.Ct. 1038.

Here, when defense counsel referred to cases other than the present case, the prosecutor did not object, nor did she request that the court give the jury a curative instruction. She did not respond to counsel's statements by advising the jury that its job was to decide the case on the evidence in this case, as opposed to counsel's assertions comparing this case to others.

The objected to comments, that the officers could lose their pensions and their livelihood if they lied, and that these

---

7. The Arizona Supreme Court went on to hold that, although defense counsel's comment was improper, it was not sufficiently provocative to invite the prosecutor's response in closing that " '[h]ad this been a weak case, the court would have directed us out.' " *State v. Cortez,* 101 Ariz. 214, 418 P.2d 370, 371 (1966).

honorable officers "told the truth," were not a response to defense counsel's argument that this was one of the lamest prosecutions he had seen. Rather, it was a response to defense counsel's attacks on the credibility of the officers, and we have already concluded that these credibility attacks were not improper.

Thus, the prosecutor's response, vouching for the credibility of the State's primary witnesses against appellant, was not a reasonable response to an improper defense remark; we cannot say that the comments did no more than "right the scale" after an improper defense comment. The invited response doctrine does not salvage the prosecutor's remarks in this case.

### D. Prejudicial Error

 There is one final step in our analysis. Even though the prosecutor's comments were improper, and they were not a reasonable response pursuant to the opened door doctrine or the invited response doctrine, reversal is not automatically mandated. Rather, " 'reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.' " *Spain*, 386 Md. at 158, 872 A.2d 25 (quoting *Degren*, 352 Md. at 430–31, 722 A.2d 887). *Accord Donaldson, supra*, 416 Md. at 496–97, 7 A.3d 84. "In determining whether an error prejudiced the defendant, that is, whether the error was harmless, 'the determinative factor . . . has been whether or not the [error], in relation to the totality of the evidence, played a significant role in influencing the rendition of the verdict, to the prejudice of the [defendant].' " *Degren*, 352 Md. at 432, 722 A.2d 887 (quoting *Dorsey v. State*, 276 Md. 638, 653, 350 A.2d 665 (1976)). To find harmless error, we must be " 'able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict.' " *Lee*, 405 Md. at 164, 950 A.2d 125 (quoting *Dorsey*, 276 Md. at 659, 350 A.2d 665).

To assess whether a prosecutor's improper statements constitute reversible error, we consider various factors, including "the severity of the remarks, cumulatively, the weight of the evidence against the accused and the measures taken to cure any potential prejudice." *Lee,* 405 Md. at 174, 950 A.2d 125. *Accord Henry v. State,* 324 Md. 204, 232, 596 A.2d 1024 (1991) (court must assess: " '1) the closeness of the case, 2) the centrality of the issue affected by the error, and 3) the steps taken to mitigate the effects of the error' ") (quoting *Collins v. State,* 318 Md. 269, 280, 568 A.2d 1 (1990)), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992).

An important factor in assessing the prejudicial effect of improper statements is the strength of the State's case against the defendant. If the State has a strong case, the likelihood that an improper comment will influence the jury's verdict is reduced. *See Young,* 470 U.S. at 19–20, 105 S.Ct. 1038 (although prosecutor's comments during rebuttal closing argument expressing his personal opinion about the credibility of a witness was improper, it did not prejudice the defendant because overwhelming evidence of guilt "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations"); *Wilhelm,* 272 Md. at 427, 326 A.2d 707 ("Another 'important and significant factor' where prejudicial remarks might have been made is whether or not the judgment of conviction was 'substantially swayed by the error,' or where the evidence of the defendant's guilt was 'overwhelming.' ").

Here, the State's case against appellant primarily involved the testimony of Detectives Wilson and Carrington. They were the only witnesses to testify regarding the observations of what appeared to be a drug transaction and the recovery of 13 ziploc bags of cocaine on appellant's person. There was no confession by appellant, nor any fingerprints, photographs, or other circumstantial evidence to corroborate the detective's testimony regarding their observations. Although the detectives' testimony certainly was sufficient to support the jury's guilty verdict, it cannot be characterized as overwhelming.

This factor weighs against a finding that the prosecutor's comments did not influence the verdict.

In *Donaldson, supra,* 416 Md. at 499–500, 7 A.3d 84, the Court of Appeals came to a similar conclusion. In that case, where Donaldson's "entire defense centered on the detectives' credibility and the accuracy of their testimony," and where the evidence was strongly disputed, the Court stated that it could not conclude that the evidence "was so overwhelming that the prosecutor's improper statements could not have influenced the jury's verdict." *Id.*

 The next factor to consider is the nature of the prosecutor's remarks. In assessing this factor, we consider whether there was one isolated comment, as opposed to multiple improper comments, and whether the comments related to an issue that was central to a determination of the case or a peripheral issue.

In *Spain,* 386 Md. at 159, 872 A.2d 25, for example, in finding that the vouching by the prosecutor was harmless error, the Court of Appeals noted that the prosecution made only one improper comment, "an isolated event that did not pervade the entire trial." In *Donaldson, supra,* 416 Md. at 498, 7 A.3d 84, by contrast, the Court found the prosecutor's improper vouching to be prejudicial error, noting that the prosecutor made several improper comments "that played an important role" in closing argument.[8]

Here, as in *Donaldson,* the prosecutor made several improper comments in an attempt to bolster the credibility of Detectives Wilson and Carrington. These detectives were the sole witnesses to the events giving rise to appellant's conviction. The credibility, or lack thereof, of these witnesses was the critical issue in this case, and it was the centerpiece of

---

8. The Court stated that the "improper statements played an important part in the prosecutor's closing and rebuttal arguments, the trial court gave no contemporaneous, curative instructions, and the evidence against Petitioner was not so strong that the improper statements could not have influenced the verdict." *Donaldson v. State,* 416 Md. 467, 500–01, 7 A.3d 84 (2010).

appellant's defense. The importance of the issue, and the repeated improper remarks, weigh against a finding of harmless error. *See Weatherspoon*, 410 F.3d at 1151 (where "the case … was not particularly strong and depended in large measure on witness credibility," improper vouching by the prosecutor "present[s] a strong possibility of prejudicial effect").

The final factor to consider is whether the trial court gave any curative instructions. Here, the court did attempt to minimize the prejudice from the prosecutor's comments. On two occasions, the court told the jury that the prosecutor was not permitted to express her opinion. When the prosecutor first stated that the detectives were "honorable men," the trial judge instructed the jurors that the prosecutor's opinion was "not evidence in this case," stating that the prosecutor was merely "permitted to draw an inference as to how you should think rather than how she thinks." When the prosecutor again stated that the detectives were honorable and "told the truth," the court instructed the jury: "Again, the State is sounding like its [sic] expressing its own opinion, which its [sic] not permitted to do. Please accept that as an invitation to draw an inference."

Moreover, in its initial jury instructions, the court instructed:

You are the sole judge of whether a witness should be believed. In making this decision you may apply your own common sense and everyday experiences. In determining whether a witness should be believed, you should carefully judge all of the testimony and evidence and the circumstances under which the witness testified. You should consider such factors as (1) the witness behavior on the stand and manner of testifying; (2) did the witness appear to be telling the truth; (3) the witness opportunity to see or hear things about which testimony was given; (4) the accuracy of the witness's memory; (5) does the witness have a motive not to tell the truth; (6) does the witness have an interest in the outcome of the case; (7) was the witness's testimony consistent; (8) was the witness's testimony sup-

ported or contradicted by evidence that you believe; and (9) whether and the extent to which the witness's testimony in court differed from any statements made by the witness on any previous occasion.

You need not believe any witness, even if the testimony is uncontradicted. You may believe all, part or none of the testimony of any witness.

In *Spain*, 386 Md. at 159–60, 872 A.2d 25, where the prosecutor improperly vouched for the credibility of the State's witness, the Court of Appeals looked to similar curative instructions in finding no reversible error. In that case, the trial court responded to the prosecutor's argument with an instruction that the prosecutor's statements were merely argument, and, similar to this case, the court instructed the jurors prior to deliberations that the jurors were the sole judge of the credibility of the witnesses. *Id.* at 160–61, 872 A.2d 25.

In finding that the curative instructions diminished any undue prejudice, the Court weighed the effect of the curative instruction against the other relevant factors. *Id.* at 161, 872 A.2d 25. The Court noted that there had been only one improper comment by the prosecutor, and it further noted that the potential impact of the comments was limited given that the defense argument was that the police officer had a faulty memory, not that he had lied. *Id.* The Court held that, given "the relative lack of severity of the improper remarks, the lack of potential impact of the erroneous argument," and the curative instruction given by the judge, the erroneous argument "in no way influenced the verdict." *Id.*

Here, by contrast, after weighing all the factors, we conclude that a new trial is warranted. The prosecutor made not one, but several, improper comments. The comments dealt with the credibility of the detectives, the central issue in the case. Under these circumstances, and given that the primary evidence against appellant was the detectives' testimony, we cannot say that the curative instructions given by the judge were sufficient to cure the potential prejudice from the improper vouching. We are unable to conclude, beyond a rea-

sonable doubt, that the comments did not influence the jury to the defendant's prejudice.

## II.

## REMAINING ISSUES

Appellant raises two further questions on appeal. Because we are reversing appellant's convictions, and the issue regarding rebuttal testimony is not likely to recur, we will not address it. Because the issue regarding the suppression of the drugs is likely to arise at a retrial, we will address it for guidance to the parties and the circuit court.

Appellant contends that the trial court erred in denying his motion to suppress the drugs found on his person, arguing that the police did not have probable cause to arrest him. The State contends that the trial court "correctly denied [appellant's] motion to suppress cocaine found on his person where the court found the Detectives' testimony credible and that testimony provided probable cause for arrest."

The standard of review for a circuit court's decision on a motion to suppress is well-settled:

"In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the evidence contained in the record of the suppression hearing. The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. We undertake our own constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case."

*McFarlin v. State,* 409 Md. 391, 403, 975 A.2d 862 (2009) (quoting *Rush v. State,* 403 Md. 68, 82–83, 939 A.2d 689 (2008)).

Here, the suppression court, crediting the testimony of the detectives, stated that there was substantial precedent permitting a finding of probable cause when police officers observed

a cash transaction for an unidentified object, if the surrounding circumstances suggested that the unidentified object was contraband. The court concluded that, given the nature of appellant's interaction with the unknown woman, and the fact that appellant then reached into his sock, the police had probable cause to arrest appellant.

This Court recently discussed the concept of probable cause:

To determine whether probable cause exists, we consider the totality of the circumstances, in light of the facts found to be credible by the trial judge, factoring in the variables of the information leading to police action, the environment, the police purpose, and the suspect's conduct. Probable cause exists where the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense.

*Stokeling v. State,* 189 Md.App. 653, 663, 985 A.2d 175 (2009) (quotations omitted), *cert. denied,* 414 Md. 332, 995 A.2d 297 (2010).

The testimony in this case supports the suppression court's finding that there was probable cause to believe that appellant was in possession of a controlled dangerous substance. Detectives Wilson and Carrington responded to the area in response to a complaint of narcotics activity. They observed a woman ask an unknown man if there was "any ready out," a term that, in their experience, is used to refer to cocaine. The man directed the woman to an alley where appellant was standing. The Detectives observed the woman and appellant talk briefly, whereupon the woman reached into her purse to take out money, while the appellant reached into his sock. Detective Wilson, who was accepted as an expert in the "identification, packaging and sale of narcotics, specifically cocaine, within Baltimore City," testified that he believed that a narcotics transaction was about to occur.

In *Williams v. State*, 188 Md.App. 78, 981 A.2d 46, *cert. denied*, 411 Md. 742, 985 A.2d 539 (2009), this Court addressed a similar scenario. In that case, a police officer, who testified as an expert in controlled substance transactions, observed Williams hand a small object to another man in exchange for money. *Id.* at 83, 981 A.2d 46. The officer testified that, "based on his experience and training, he believed that appellant was the dealer and the other man was the buyer." *Id.* at 84, 981 A.2d 46. The transaction occurred in an area described as an " 'open air drug market.' " *Id.* at 93, 981 A.2d 46.

This Court rejected the argument that probable cause could not be found because the officer could not identify the objects exchanged. *Id.* at 95–97, 981 A.2d 46. Judge Hollander, writing for this Court, noted that "many other jurisdictions that have considered the issue [have] concluded that probable cause may be found even if a trained, experienced police officer is not able to see whether the object transferred by one person to another was contraband." *Id.* at 93, 981 A.2d 46. We held that the officer "did not need absolute certainty in regard to the objects that were exchanged . . . to obtain probable cause," and that, under the totality of the circumstances, the officer had probable cause to believe he had observed a drug transaction. *Id.* at 96–97, 981 A.2d 46. *Accord Donaldson*, 416 Md. at 486–87, 7 A.3d 84 (probable cause to arrest based on exchange of unidentified item for money "if the totality of the circumstances supports the conclusion that the exchange involved an unlawful substance").

Applying this analysis, the detectives in this case had probable cause to arrest appellant. Detective Wilson, who responded to the area in response to a complaint of narcotics activity, and who was accepted as a drug expert, testified that, based on his experience, he believed that a drug transaction was about to occur. That the police did not wait to observe drugs actually be exchanged is of no moment. The evidence was sufficient to support the trial court's finding that there was probable cause to arrest, which permitted a search of appellant's person incident to arrest. *See Stokeling*, 189 Md.App. at 671–72, 985 A.2d 175 (once the police had probable cause to

arrest appellant for drug possession, they were justified in searching his person incident to arrest).

**JUDGMENT REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BALTIMORE CITY.**