REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 1106

September Term, 2013

_____

ANTOMAR JONES

v.

STATE OF MARYLAND

_____

Woodward,
Nazarian,
Reed,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  June 27, 2014

A spectator at appellant Antomar Jones's trial in the Circuit Court for Baltimore City could be forgiven for wondering whether the prosecution and defense were describing the same series of events. The two stories shared common elements, not least the core fact that Anthony Taylor, the main prosecution witness, was shot and Corey Alexander killed on the night of February 1, 2012. But although there was, as we find below, sufficient evidence to support the jury's eventual decision to convict Mr. Jones on a variety of charges, no physical evidence connected Mr. Jones to the shooting, and the case turned heavily on the relative credibility of Mr. Jones versus Mr. Taylor. For that reason, we hold that the prosecutor's reliance during closing argument on a fact not in evidence strayed beyond the bounds of fair advocacy and that the error was not harmless. We reverse Mr. Jones's convictions, remand for further proceedings, and address one other legal question that could well re-emerge on remand.

## I. BACKGROUND

Because our analysis relates more to witness credibility than to the jury's resolution of fact disputes, we begin by recounting the contrasting versions of events that witnesses offered at trial.

### A. Mr. Taylor's Account

Mr. Taylor testified that he and Mr. Alexander were best friends and roommates before the shooting. He knew Mr. Jones, whose friend had been mentored by Mr. Alexander through a program called Life Renewal Services, and testified that Mr. Alexander had begun mentoring Mr. Jones as well.

At about 8:45 p.m. on February 1, 2012, Mr. Alexander told Mr. Taylor that he was driving to Mr. Jones's residence in Baltimore City to give him a ride, and Mr. Taylor decided to join him. When they arrived, Mr. Jones entered the back seat, and they drove toward Caton Avenue, where they had planned to drop Mr. Jones off. However, when Mr. Alexander reached back to shake Mr. Jones's hand, Mr. Jones pulled out a large caliber automatic gun and said, "you all know what time it is" and that he "want[ed] everything out of [their] pocket[s]." Mr. Taylor had about sixteen dollars and Mr. Alexander had "a couple" of dollars.[1] They each threw their money and a phone into the back seat.[2] Mr. Jones then demanded they drive to Mr. Alexander's house, but when they arrived, Mr. Taylor told Mr. Jones that the neighbors had surveillance cameras, so Mr. Jones told him to "pull off," and they drove instead to a nearby alley. Upon arriving, Mr. Taylor attempted to exit the car, and Mr. Jones shot him in the face; he was able to run to Good Samaritan Hospital, and he said that he thought he heard another gunshot as he ran. While Mr. Taylor was being treated, a Baltimore City police officer asked him to identify the shooter, but he responded "that it was an unknown assailant" and that he "didn't know."

---

[1] Contrary to his account at trial, Mr. Taylor told police officers that he had twenty dollars and Mr. Alexander had about thirty dollars. And later, Mr. Taylor told Michael Jones, a police agent and a friend of Mr. Taylor's family (and no relation to the appellant), that he had forty dollars and Mr. Alexander had a few hundred dollars.

[2] Messrs. Taylor and Alexander each had two cell phones in their possession when they picked up Mr. Jones.

2

Good Samaritan transferred Mr. Taylor to University of Maryland Shock Trauma, and while there, he was interviewed by Baltimore City Police officers. During that interview, he explained that Mr. Jones had shot him, and he identified Mr. Jones from a photo array. He remained in Shock Trauma for two weeks.

## B. Mr. Jones's Account

Mr. Jones testified that he knew Mr. Alexander through his brother's Life Renewal Services mentor, and had met Mr. Taylor through Mr. Alexander.[3] He also said that he began purchasing marijuana from them in October or November 2011.

On January 31, 2012, Mr. Jones spoke with Mr. Alexander by phone at 9:37 p.m., then again on February 1 at around 12:30 p.m. During the February 1 conversation, Mr. Alexander informed Mr. Jones that he would be acquiring marijuana later that day and asked Mr. Jones to check back with him later. Mr. Jones called Mr. Alexander at 9:19 p.m., and Mr. Alexander told him he would come to his house with the marijuana. They spoke again at 9:25 p.m. and at 9:34 p.m. After receiving the 9:34 p.m. call from Mr. Alexander, Mr. Jones left the house to meet Mr. Alexander outside. He described a very different interaction with Messrs. Alexander and Taylor:

> [MR. JONES]: Okay. I got in the car, first [Mr. Alexander]
> turned around and said hey, what's up, shook my hand. Then

---

[3] Mr. Jones disputed that Mr. Alexander had mentored him. To the contrary, he testified that Mr. Alexander was not his mentor and that it was his "understanding [that] he's not a mentor."

I talked to [Mr. Taylor], he turned around and said hey, what's up, shook my hand.

At that moment I noticed my phone had vibrated, so I looked down and saw that it was my girlfriend, when I go to answer it, the phone cut off. So, I said can I use my car charger?[4] Plugged my phone up, we began talking, asked me what I was doing all day, I said I was in the house with my girlfriend all day.

Then after that, purchased the marijuana,[5] got out of the car, went back in the house.

[COUNSEL FOR MR. JONES:] Now, when you got out of the car—how long do you think you were in the car?

[MR. JONES:] I want to say I was in the car like . . . five minutes tops, but when you talking it could run over.

---

[4] Mr. Taylor disputed that Mr. Jones asked to charge his phone:

> [COUNSEL FOR THE STATE:] And during that time period did [Mr. Jones] try to charge his phone inside of the vehicle?
>
> [MR. TAYLOR:] No, he didn't.

[5] Mr. Taylor disputed that the marijuana transaction occurred:

> [COUNSEL FOR THE STATE:] And on February 1, 2012, when you went to pick up [Mr. Jones] did you try to sell drugs to [Mr. Jones]?
>
> [MR. TAYLOR:] No, I did not.
>
> [COUNSEL FOR THE STATE:] Did Mr. Alexander try to sell drugs to [Mr. Jones]?
>
> [MR. TAYLOR:] No, he did not.

\* \* \*

[COUNSEL FOR MR. JONES:] Okay. Now you were in the car five plus minutes, you get out of the car, what happens, if anything, next?

[MR. JONES:] I'm walking back to my house and they honk the horn, they say hey you left your phone. I come back, I get my phone and then I run in the house.

[COUNSEL FOR MR. JONES:] Okay. And do you recall about what time you may have gotten in the house?

[MR. JONES:] It probably was like 9:40, maybe 9:45.

\* \* \*

[COUNSEL FOR MR. JONES:] Did you have any situation where you were riding around in the car . . . ?

\* \* \*

[MR. JONES:] No. I never left my home. I don't know where they went when they left, but I went back in the house.

[COUNSEL FOR MR. JONES:] Did you have any involvement with the homicide of Mr. Alexander . . . and attempted homicide of Mr. Taylor?

[MR. JONES:] I had no idea what happened to them.

According to Mr. Jones, he had no additional communications or interactions with Messrs. Alexander and Taylor that night.

The State questioned Mr. Jones later on about the make and model phone he had that night, an exchange that will prove important later:

[COUNSEL FOR THE STATE:] And what kind of phone did you have?

5

[MR. JONES:] I can tell you it was a 3G. I don't—

[COUNSEL FOR THE STATE:] Well, what did it look like?

[MR. JONES:] It was a touch screen phone.

[COUNSEL FOR THE STATE:] Okay. Was it a Galaxy?

[MR. JONES:] No.

[COUNSEL FOR THE STATE:] Was it an Android?

[MR. JONES:] I really don't remember.

[COUNSEL FOR THE STATE:] Was it an [iPhone]?

[MR. JONES:] It definitely wasn't an [iPhone].

C.     **The Investigation**

On February 1, 2012, Detective Shawn Reitchenberg of the Baltimore Police Department's Homicide Unit was assigned to investigate the homicide of Mr. Alexander and shooting of Mr. Taylor. According to Detective Reitchenberg, officers arrived on the scene that night at around 11:00 p.m., and he arrived at 2:00 a.m. When he examined Mr. Alexander's vehicle, he saw a large amount of blood in the front seat and found two cell phones, some money, a glass bottle, a banana, and shell casings in the back seat. Detective Reitchenberg then described what happened next:

> We observed the blood from the driver's side of the vehicle. You could clearly see a blood trail that went out of the driver's side [of the] vehicle] and then up Nasco Place toward Good Samaritan Hospital. . . . There were several cars that had blood smear marks on them and the blood trail continued on the street.

6

> The entire scene was processed, photographed and that vehicle was towed to the crime lab bay at the Headquarters Unit to be processed.

*   *   *

> By the time we were done, or I was done at the crime scene with the crime lab and other detectives, I responded to Good Samaritan Hospital in an attempt to not only see but speak with the non-fatal victim.  But I was advised that he had already been transported to Shock Trauma based upon the seriousness of his condition.

Detective Reitchenberg visited Mr. Taylor at Shock Trauma on February 2, 2012.  Mr. Taylor provided the detective with the first name of an individual—Antomar—and a description.  The detective returned to his office, researched the name Antomar, and "came up with an individual with the name Antomar who fit the physical description" provided by Mr. Taylor.  He then put Mr. Jones's picture in a photo array and returned to Shock Trauma to show the array to Mr. Taylor.  Mr. Taylor identified Mr. Jones in less than a minute.

Soon after, Detective Reitchenberg obtained a warrant for Mr. Jones's arrest, and he was arrested on February 3 at about 3:30 a.m.  The police executed a search of Mr. Jones's home, but found nothing of evidentiary value.  The detective then spoke with Mr. Jones at 5:50 a.m., and Mr. Jones agreed to make a recorded statement that ultimately was played for the jury.  The statement mirrored the testimony that he provided at trial.

7

The police were unable to find any physical evidence—"no bloody clothes, no gun, no money, or anything else"—tying Mr. Jones to the crime.[6]

### D.     Trial and Sentencing

Mr. Jones was tried for the murder of Mr. Alexander and the attempted murder of Mr. Taylor, among other crimes, during a three-day trial held between May 13 and 16, 2013.  After the court heard testimony from nine witnesses, including the conflicting reports provided by Messrs. Taylor and Jones, the jury found Mr. Jones guilty of felony murder of Mr. Alexander; attempted first-degree murder of Mr. Taylor; robbery with a dangerous weapon; use of a handgun in the commission of a crime of violence; possession of a regulated firearm by a person under the age of twenty-one; and wearing, carrying, and transporting a handgun in a vehicle.  The court sentenced him to life in prison for the felony murder conviction, a consecutive thirty-five year term for attempted murder, a consecutive one-year term for possession of a regulated firearm by a person under twenty-one, and a number of concurrent prison terms.  This appeal followed.

## II. DISCUSSION

Mr. Jones presents five questions on appeal:

> 1.     Did the trial court err in preventing [Mr.] Jones from impeaching a key State's witness with a prior conviction?

---

[6] The police used various forensic techniques to investigate the shooting, but recovered no helpful information.

2.      Did the trial court err in forcing [Mr.] Jones to testify before his other witness?

3.      Did the trial court err in excluding a defense witness?

4.      Was the evidence of robbery insufficient?

5.      Did the trial court err in permitting the State to argue facts not in evidence in closing?

After working through these issues, we find merit in the last, which we address first. Our decision to reverse and remand for a new trial requires us also to address Mr. Jones's challenge to the sufficiency of the evidence, which we reject. And because his first question presents a discrete legal issue that likely will recur on remand and that has not been addressed by any Maryland appellate decisions, we analyze it as well and find no error.

**A.** **The Circuit Court Erred In Permitting The State To Argue From A "Fact" Neither In Evidence Nor A Matter Of Common Knowledge.**

Because no physical evidence linked Mr. Jones to the shooting, the outcome of the trial turned heavily on which version of events the jury believed, which in turn hinged on the relative credibility of the witnesses. In the course of closing argument, the State argued that the phone charger in Mr. Alexander's car, pictured in State's Exhibit 19, was an iPhone charger. This fact, in the State's view, disproved Mr. Jones's story because he could not have plugged his phone (which he had said "definitely wasn't an [iPhone]") into an iPhone charger during his encounter with Messrs. Taylor and Alexander:

9

[COUNSEL FOR THE STATE:] He said his girlfriend was calling him and he was in the car for maybe five, ten at the most 15 minutes. But his house was just across the way, he said it took him maybe 30 seconds. He was so worried about the phone call from his girlfriend that he needed a charger right then and there, so he charged the phone.

I asked him, well what kind of phone did you have? He said I don't know if it was a Samsung, I don't know. I asked him if it was a Samsung, I don't know. Was it an [iPhone]? Definitely not an [iPhone]. *State's Exhibit 19, the charger hanging out of the cigarette lighter in the Mr. Alexander's car is for an [iPhone]*.

[COUNSEL FOR MR. JONES]: Objection, Your Honor.

THE COURT: Overruled.

[COUNSEL FOR THE STATE]: And if any of you have phones you can look at it and see if your non-[iPhone] would fit into this charger. And it was so important for him to charge that phone he had to do it right then and there even though he could go right back into his house where then he charged the phone.

(Emphasis added.) Mr. Jones objected, and he argues here, that this argument relied on a fact not in evidence—the "fact" that the charger in the photo was a charger compatible only with iPhones—because "there was no testimony as to what kind of phone charger it was." And the State concedes that "there was no testimony as to the type of phone charger found in the car," but counters that "a juror applying common knowledge could reasonably conclude that [the] white cord seen in State's Exhibit 19 . . . was an iPhone charger." We hold that under these circumstances, where there was no testimony one way or the other about the charger and the case turned so heavily on credibility, the

prosecutor's argument from facts not in evidence was improper and the error was not harmless.

During closing arguments, "[t]he prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom." *Lee v. State*, 405 Md. 148, 163 (2008) (quoting *Degren v. State*, 352 Md. 400, 429-30 (1999)).

> [I]t is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. . . . Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the prosecution produces.

*Sivells v. State*, 196 Md. App. 254, 270 (2010) (quoting *Mitchell v. State*, 408 Md. 368, 380 (2009)). The prosecutor may also "argue to the jury—even though evidence of such facts has not been formally introduced—matters of common knowledge or matters of which the court can take judicial notice." *Wilhelm v. State*, 272 Md. 404, 438 (1974). A prosecutor's artistic license is not unlimited: "[n]otwithstanding the wide latitude afforded prosecutors in closing arguments, a defendant's right to a fair trial must be

protected." *Lee*, 405 Md. at 164 (citing *Degren*, 352 Md. at 430; *Wilhelm*, 272 Md. at 415-16). But an improper argument does not necessarily require reversal and retrial:

> "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its independent review of the record, is able to a declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict."

*Id.* (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)); *see also Lawson v. State*, 389 Md. 570, 591 (2005) ("'[R]eversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.'" (quoting *Spain v. State*, 386 Md. 145, 158 (2005))); *Sivells*, 196 Md. App. at 271 (asking "whether reversal is required because, under the totality of the circumstances, the [comment was] likely to have improperly influenced the verdict").

### 1. The prosecutor's remark was improper.

Although Mr. Jones was asked about the make and model of his phone, the State introduced no evidence at trial about the make, model, or compatibility of the phone charger that appeared in the photograph of the car. In delivering closing arguments, a prosecutor may not "'comment upon facts not in evidence or . . . state what he or she would have proven," *Donaldson v. State*, 416 Md. 467, 489 (2010) (quoting *Mitchell*, 408 Md. at 381), although she *may* argue to the jury matters of "common knowledge," even if

12

evidence of such facts has not been formally introduced. *Wilhelm*, 272 Md. at 438. "Matters of common knowledge" are those matters "which every informed individual possesses." *Id.* at 439. Put plainly, "'[j]urors may be reminded of what everyone else knows.'" *Smith v. State*, 388 Md. 468, 487 (2005) (quoting *Wilhelm*, 272 Md. at 439).

Because the State concedes that the trial evidence did not identify the type of phone charger that was in Mr. Alexander's vehicle, we examine first whether the prosecutor acted improperly in filling that evidentiary gap during closing argument. The State argues that "a juror applying common knowledge could reasonably conclude that [the] white cord seen in State's Exhibit 19 . . . was an iPhone charger," and the State's brief on appeal described the widespread use of iPhones:

> To say that the iPhone is ubiquitous would be an understatement. In the fourth fiscal quarter of 2013, Apple sold 33.8 million iPhones, up from 26.9 million iPhones in the same quarter last year. As of August 2012, Apple had sold 85 million iPhones in the United States since the product's launch in 2007. Thus, the fact that iPhones (and other Apple products) use distinctive white cords, like the one depicted in the photographs in this case, is a matter of common knowledge.

(Internal quotation marks and footnotes omitted.) But the issue is not whether iPhones are common or popular, or even whether iPhone charger cords are white. The prosecutor argued from the *inverse* proposition—*i.e.*, that white chargers can *only* charge iPhones—that Mr. Jones must have been lying when he testified that he charged his non-iPhone in the car. Even if it were true that iPhones can be charged only by white-corded chargers (a proposition we have not attempted to prove or disprove), it would not follow that other

13

brands of phones could be charged only by non-white charger cords. [7] We are not persuaded that "every informed individual" would know that the charger pictured in State's Exhibit 19 was an iPhone charger or that it is common knowledge that phone chargers with a white cord can only charge iPhones. Accordingly, the prosecutor's remark was improper and the trial court erred in overruling Mr. Jones's objection.

### 2. The error was not harmless.

The State contends that the prosecutor's remark, even if improper, couldn't have misled the jury to the prejudice of Mr. Jones because "[t]he prosecutor did not . . . suggest that she knew based on facts not in evidence that the charger was for an iPhone," and "[only] directed the jury to a photograph that was in evidence[, so the jurors] could . . . decide for themselves whether the white cord was an iPhone charger." We disagree that the prosecutor gave the jury such a choice. To the contrary, the prosecutor told the jury that "the charger hanging out of the cigarette lighter in Mr. Alexander's car is *for an [iPhone]*," (emphasis added) and proposed no alternatives. But that aside, the erroneous remark was not harmless.

To determine "whether overruling defense objections to improper statements during closing argument constitutes reversible, or harmless, error," we focus our attention on three factors: *first*, "the weight of the evidence against the accused"; *second*, "the

---

[7] And because two wrongs don't make a right, we have not considered the outside-the-record prop Mr. Jones's counsel brought to oral argument in this Court for the purpose of trying to prove this last point.

severity of the remarks, cumulatively"; and *third*, "the measures taken to cure any potential prejudice." *Lee*, 405 Md. at 174 (citations omitted). "While not every impermissible comment by the prosecutor constitutes reversible error, the State bears the burden of proving that an error is harmless and must prove beyond a reasonable doubt that the contested error did not contribute to the verdict." *Id.* (citation omitted).

*First*, to determine the prejudicial effect of the prosecutor's improper remark, we examine "the strength of the State's case against [Mr. Jones]." *Sivells*, 196 Md. App. at 289. The stronger the case otherwise, the less likely that an improper closing argument remark causes prejudice, and vice-versa:

> If the State has a strong case, the likelihood that an improper comment will influence the jury's verdict is reduced. *See* [*States v. Young*, 470 U.S. 1, 19-20 (1985)] (although prosecutor's comments during rebuttal closing argument expressing his personal opinion about the credibility of a witness was improper, it did not prejudice the defendant because overwhelming evidence of guilt "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations"); *Wilhelm*, 272 Md. at 427 ("Another 'important and significant factor' where prejudicial remarks might have been made is whether or not the judgment of conviction was 'substantially swayed by the error,' or where the evidence of the defendant's guilt was 'overwhelming.'").

*Id.*; *see also Lee*, 405 Md. at 175.

Although it would not be fair to characterize the State's case against Mr. Jones as weak, there is no getting around the fact that it hinged primarily on witness testimony, and specifically whether the jury viewed Mr. Taylor's account of the evening as more

15

credible than Mr. Jones's. Other witnesses testified as to the events *following* the shooting, but Mr. Taylor and Mr. Jones were the only witnesses to testify regarding what transpired in the hours leading up to it. As in *Sivells*, "[t]here was no confession by [Mr. Jones], nor any fingerprints, photographs, or other circumstantial evidence to corroborate [either witness's] testimony regarding their observations." 196 Md. App. at 289. And although Mr. Taylor's "testimony certainly was sufficient to support the jury's guilty verdict, it cannot be characterized as overwhelming," *id.*, and it was strongly disputed by Mr. Jones. *See Donaldson*, 416 Md. at 499-500 (holding that where the "entire defense centered on the . . . credibility [of the State's witnesses] and the accuracy of their testimony," and where the evidence was strongly disputed, it could not conclude that the evidence "was so overwhelming that the prosecutor's improper statements could not have influenced the jury's verdict"). This factor weighs in favor of a finding of prejudice.

*Second*, we must consider "the nature of the prosecutor's remark." *Sivells*, 196 Md. App. at 290. "In assessing this factor, we consider [*first*,] whether there was one isolated comment, as opposed to multiple improper comments, and [*second*,] whether the comments related to an issue that was central to a determination of the case or a peripheral issue." *Id.* In *Sivells*, "the prosecutor made several improper comments in an attempt to bolster the credibility of [the State's witnesses, who] were the sole witnesses to events giving rise to the appellant's conviction." *Id.* at 290. As such, we recognized that "[t]he credibility, or lack thereof, of these witnesses was *the critical issue* in [that] case." *Id.* at 290-91 (emphasis added). Given the central role of witness credibility, as well as

16

the repeated improper remarks, we found that this factor weighed *against* a finding of

harmless error in that case. *Id.* at 291. We compared such a situation to *Spain* and

*Donaldson*:

> In *Spain*, 386 Md. at 159, for example, in finding that the vouching of the prosecutor was harmless error, the Court of Appeals noted that the prosecution made only one improper comment, "an isolated event that did not pervade the entire trial." In *Donaldson*, 416 Md. at 498, by contrast, the Court found the prosecutor's improper vouching to be prejudicial error, noting that the prosecutor made several improper comments "that played an important role" in closing argument.

*Sivells*, 196 Md. App. at 290.

This case does not analogize directly with *Sivells*, *Spain*, or *Donaldson* because in

each of those cases, the improper remark was either isolated and not critical to a central

issue (*Spain*) or repeated and critical to a central issue (*Sivells* and *Donaldson*). Here, the

prosecutor made a *singular* remark that related to an issue that was *central* to the case—

witness credibility. The conflicting testimony of Messrs. Taylor and Jones was the

centerpiece of this case, so the jury's view of each witness's credibility also played a

leading role. And "where 'the case . . . was not particularly strong and depended in large

measure on witness credibility,' improper vouching[8] by the prosecutor 'present[s] a

---

[8] Although Black's Law Dictionary defines "vouch" as "[t]o call upon, rely upon, or cite as authority," *Black's Law Dictionary* 1714 (9th ed. 2009), Maryland courts have used the term in such a way that encompasses commenting both in favor of *or against* a witness. *See Donaldson*, 416 Md. at 489-90 ("'[O]ne technique in closing argument that consistently has garnered our disapproval, as infringing on a defendant's right to a fair

strong possibility of prejudicial effect.'"  *Id.* at 291 (quoting *United States v. Weatherspoon*, 410 F.2d 1142, 1151 (9th Cir. 2005)).  The prosecutor's improper remark was isolated, but its relevance to a central issue increased its prejudicial effect.  This factor weighs *at best* neutrally, and perhaps slightly in Mr. Jones's favor.

*Finally*, to determine whether the prosecutor's remark misled or was likely to mislead the jury to the prejudice of Mr. Jones, we ask "whether or not the trial court took any appropriate action . . . such as informing the jury that the remark was improper, striking the remark and admonishing the jury to disregard it."  *Wilhelm*, 272 Md. at 423-24.  "[T]o be sufficiently curative, the judge must instruct *contemporaneously and specifically* to address the issue such that the jury understands that the remarks are improper and are not evidence to be considered in reaching a verdict."  *Lee*, 405 Md. at 177-78 (emphasis added) (citing *Miller v. State*, 380 Md. 1, 35-37 (2004)).

In *Donaldson*, we addressed the differing effects of general jury instructions given before closing arguments and instructions given contemporaneously with the improper remark:

> [T]he trial court gave the jury no contemporaneous instructions, curative, specific or otherwise.  To compensate for the lack of contemporaneous instructions, the State points to the instructions given to the jury before closing arguments began, which told the jury to "base [its] findings only on the testimony of the witnesses, the exhibits which have been received into evidence, any stipulations, . . . and any

trial, is when a prosecutor "vouches" for (or against) the credibility of a witness.'" (quoting *Spain*, 386 Md. at 153-54)).

18

conclusions which may be fairly drawn from that evidence." We have recognized that such general jury instructions have a curative effect, as "Maryland courts long have subscribed to the presumption that juries are able to follow the instructions given to them by the trial judge, particularly where the record reveals no overt act on the jury's part to the contrary." *Spain*, 386 Md. at 160. We have also noted, however, the limited curative effect of general jury instructions, given before closing arguments, because they cannot "address objectionable remarks" that have "not yet been made." *Lawson*, 389 Md. at 601-02 (distinguishing *Spain*). *As in Lawson, the lack of contemporaneous instructions in the present case suggest that the improper statements were prejudicial, even if the general instructions may have cured some of that prejudice.*

*Donaldson*, 416 Md. at 499-500 (emphasis added) (footnote omitted).

In this case, the trial judge took no contemporaneous or specific curative measures in response to the defense's objection to the State's improper remark. The judge gave the general instruction that closing arguments are "not evidence and . . . should not [be] give[n] any weight or consideration," but gave that instruction *before* the prosecutor made the improper remark. Indeed, by overruling Mr. Jones's objection to the remark, the trial judge exacerbated the resulting prejudice of the comment by giving the remark a tacit stamp of approval. *See Lee*, 405 Md. at 178.

Taken as a whole, we cannot find that the prosecutor's improper remark in no way influenced to jury. "Therefore, 'such error cannot be deemed "harmless" and reversal is mandated,'" *id.* at 179 (quoting *Dorsey*, 276 Md. at 659), and we remand for further proceedings consistent with this opinion.

19

**B.** **Sufficient Evidence Supported Mr. Jones's Conviction For Robbery With A Deadly Weapon.**

*Second*, and because the State could not retry him for robbery with a deadly weapon if we agree with him on this point,[9] we address Mr. Jones's contention that the circuit court erred in denying his Motion for Judgment of Acquittal on that charge. He argues "that there was insufficient evidence to sustain the charge of robbery with a dangerous weapon," that a rational fact-finder could not find that the victims' property had been removed from the vehicle "because the evidence showed only that the alleged robbery victims simply threw some items into the back seat of the car, and did not show that the alleged robber took any of those items with the requisite intent." We recently reaffirmed the highly deferential standard of review:

> The often repeated test for sufficiency of the evidence is, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This Court defers to the unique opportunity of the fact-finder to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses. We further decline to second-guess any reasonable inferences drawn by the fact-finder or to reweigh the fact-finder's resolution of conflicting evidence. If the evidence either showed directly, or circumstantially, or supported a rational inference of facts which could fairly

---

[9] *See Markham v. State*, 189 Md. App. 140, 168-69 (2009) (noting that despite the reversal of the appellant's convictions, we had to address his contention relating to the sufficiency of evidence because "[i]f we agreed that the evidence was insufficient to support any of his convictions, appellant could not be retried on those charges" (citing *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988); *Burks v. United States*, 437 U.S. 1, 11 (1978))).

20

convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt, then we will affirm the conviction.

*Jones v. State*, 213 Md. App. 483, 505 (2013) (alternations, citations, and internal quotation marks omitted). And after reviewing the evidence adduced at trial, we find it sufficient to support the conviction.

The crime of robbery with a dangerous weapon, Md. Code (2002, 2012 Repl. Vol.), § 3-403(a)(1) of the Criminal Law Article, required the State to prove four elements:

> In order to convict the Defendant of robbery with a dangerous weapon, the State must prove [*first*], that the Defendant took the property from Mr. Taylor and Mr. Alexander[, *second*], that he took the property by force or threat of force[, *third*], that he intended to deprived Mr. Taylor and Mr. Alexander of the property and [*fourth*,] that he used a dangerous weapon in committing the robbery.[10]

---

[10] These instructions accurately reflect the language of MPJI-CR 4:28.1, which provides that "[i]n order to convict the defendant of robbery with a dangerous weapon, the State must prove all of the elements of robbery and also must prove that the defendant committed the robbery by using a dangerous weapon." *Id.* The elements of robbery, according to the Maryland Criminal Pattern Jury Instructions, include the following:

> In order to convict the defendant of robbery, the State must prove:
>
> (1) That the defendant took the property from [the victim's presence and control];
>
> (2) that the defendant took the property by force or threat of force; and

21

*Maryland Criminal Pattern Jury Instruction* MPJI-CR 4:28.1; *see also Teixeira v. State*, 213 Md. App. 664, 681 (2013) ("The 'essential elements of the crime of robbery are the felonious taking and carry away of the personal property of another, from his person or in his presence, by violence or putting in fear,'" and "'if the State can prove that a defendant used a deadly weapon during the commission of a robbery, the defendant is subject to harsher penalties.'" (quoting *Conyers v. State*, 345 Md. 525, 558 (1997))).

To determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime [of robbery with a dangerous weapon] beyond a reasonable doubt,'" *Jones*, 213 Md. App. at 505 (quoting *Bordley v. State*, 205 Md. App. 692, 716 (2012)), we examine the evidence the State produced at trial. Mr. Jones does not challenge elements two through four, but focuses on the first, arguing that the evidence does not support a finding that Mr. Jones took property from Messrs. Taylor and Alexander.[11] To establish this

---

> (3) that the defendant intended to deprive [the victim] of the property.

MPJI-CR 4:28.

[11] Even so, the evidence, viewed in the State's favor, established these remaining elements. Assuming for the moment that Mr. Jones in fact took property from the alleged victims, Mr. Taylor testified that Mr. Jones entered the vehicle, pulled out a large-caliber automatic gun, and said "you all know what time it is," and "let me get your money, your phone, . . . your wallet, I want everything out of your pockets." If Mr. Jones took the property the victims threw into the back seat, Mr. Taylor's testimony would support a finding that he did so by threat of force, used a dangerous weapon in committing the

point, Mr. Jones directs us to the amount of money that the victims allegedly threw into the back seat and the amount of money found in the car. He concedes that the victims, in response to the alleged robber's gun-point demands, "tossed their phones and some money into the back seat," but contends that a rational juror could not conclude beyond a reasonable doubt that the contents *found* in the back seat were any less than the contents *thrown* there.

At trial, Rodney Montgomery, a Crime Laboratory Technician for the Baltimore City Police, and Detective Reitchenberg testified about the items they found in the back seat of the vehicle. Mr. Montgomery identified most of them:

> [COUNSEL FOR MR. JONES:] All right, and what was the total of dollar bills that were there in the backseat?
>
> [MR. MONTGOMERY:] Five dollars.
>
> [COUNSEL FOR MR. JONES:] A total of five dollars?
>
> [MR. MONTGOMERY:] Yes.
>
> * * *
>
> [COUNSEL FOR MR. JONES:] Now you said that you recovered two cell phones and a cell phone case?
>
> [MR. MONTGOMERY:] No, I didn't recover the cell phones. Those were recovered by the detective. I recovered the cell phone case.

---

robbery, and intended to deprive the victims of their property. All that remains, then, is whether the evidence was sufficient to support a finding that Mr. Jones took the victims' property in the first place.

Then Detective Reitchenberg closed the loop:

> [COUNSEL FOR THE STATE:] And could you describe the condition of the vehicle?
>
> [DETECTIVE REITCHENBERG:] . . . There were items in the back of the car. There was two cell phones, there was some U.S. currency, I believe there was a glass bottle back there, or a plastic bottle. There was a banana, I remember it being back there. Shell casings were also found.

Between the two officers, the testimony easily supports a finding that five dollars and two cell phones were *found* in the vehicle.

Mr. Jones argues that "while one might speculate that more than $5 and more than 2 phones were thrown into the back seat, there is no evidence from which a rational juror could conclude beyond a reasonable doubt that this was the case." We disagree. If the State introduced evidence showing that Messrs. Taylor and Alexander threw money and/or items into the back seat in excess of that recovered, it follows logically that a rational juror could have found that the alleged robber took their property. And it doesn't matter if Mr. Jones took less than all of the property the victims threw into the back seat—if he robbed them of some of it and left some, he still robbed them.

The testimony of the victims themselves bolsters the point. Mr. Taylor testified that he and Mr. Alexander threw phones and money into the back seat in response to the robber's gun-point demands:

> [COUNSEL FOR THE STATE:] And do you remember how much money you had on you?
>
> [MR. TAYLOR:] I probably had about $16.

24

[COUNSEL FOR THE STATE:] And then what did you do with your money?

[MR. TAYLOR:] I just threw it in the back seat.

[COUNSEL FOR THE STATE:] And what else, if anything, did you throw back?

[MR. TAYLOR:] A cell phone.

[COUNSEL FOR THE STATE:] And anything else?

[MR. TAYLOR:] No.

[COUNSEL FOR THE STATE:] What about Mr. Alexander?

[MR. TAYLOR:] I know he gave him his phone. I believe he gave him his wallet and some, he had like I guess a couple of dollars in his pocket because I seen him throw some money back there.

By their reckoning, the victims threw, at a minimum, eighteen dollars (sixteen from Mr. Taylor and "a couple" from Mr. Alexander), two cell phones (one from each victim), and a wallet into the back seat. Coupled with the officers' testimony that five dollars and two cell phones were later found in the vehicle, a rational juror could deduce that the alleged robber took at least thirteen dollars and a wallet from the victims. The first element of robbery with a dangerous weapon—taking property from the victims—was therefore satisfied. And because Mr. Jones does not challenge the evidentiary support for the crime's remaining three elements, a rational trier of fact could have found beyond a reasonable doubt that Mr. Jones committed the crime of robbery with a dangerous weapon.

25

## C. Attempted Second-Degree Murder Is Neither An Infamous Crime Nor Relevant To Credibility.

*Finally*, Mr. Jones contends that the trial court erred in granting the State's motion *in limine* precluding him from impeaching Mr. Taylor with a prior conviction for attempted second-degree murder entered more than fourteen years before trial. He argues that the court incorrectly balanced "the probative value of this evidence against the possibility of prejudice to [Mr.] Taylor or the State," and that the court erred by failing to consider attempted second-degree murder as "the moral equivalent of an infamous crime." No reported decision has addressed this particular crime, and we hold that the balancing of probative value and prejudice was unnecessary because attempted second-degree murder fails at the threshold of Maryland Rule 5-609.

Rule 5-609 governs the admission of evidence of a conviction for the purpose of impeaching a witness:

> (a) **Generally.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or objecting party.

> (b) **Time limit.** Evidence of a conviction is not admissible under this Rule if a period of more than 15 years has elapsed since the date of the conviction.

26

In *King v. State*, 407 Md. 682, 698 (2009), the Court of Appeals applied the test it delineated in *State v. Westpoint*, 404 Md. 455 (2008), which held that the Rule 5-609 analysis stops if the crime underlying the prior conviction does not qualify either as infamous or relevant to the witness's credibility:

> First, subsection (a) sets forth the "eligible universe" for what convictions may be used to impeach a witness's credibility. This universe consists of two categories: (1) "infamous crimes" and (2) "other crimes relevant to the witness's credibility." Infamous crimes include treason, common law felonies, and other crimes classified as *crimen falsi*. *If a crime does not fall within one of the two categories, then it is inadmissible and the analysis ends.* This threshold question of whether or not a crime bears upon credibility is a matter of law. If a crime falls within one of the two categories in the eligible universe, then the second step is for the proponent to establish that the conviction was not more than 15 years old, that it was not reversed on appeal, and that it was not the subject of a pardon or a pending appeal. Finally, in order to admit a prior conviction for impeachment purposes, the trial court must determine that the probative value of the prior conviction outweighs the danger of unfair prejudice to the witness or objecting party. This third step is clearly a matter of trial court discretion.

*King*, 407 Md. at 698-99 (emphasis added) (quoting *Westpoint*, 404 Md. at 477-78).

The threshold question here is whether Mr. Taylor's conviction for attempted second-degree murder is either an "infamous crime" or as an "other crim[e] relevant to the witness's credibility." We hold that this conviction falls within neither category, and thus that the circuit court correctly precluded Mr. Jones from using it to impeach Mr. Taylor at trial.

27

### 1. Attempted second-degree murder is not an infamous crime.

The universe of infamous crimes "include[s] treason, common law felonies, and other crimes classified as *crimen falsi*." *Id.* at 699 (quoting *Westpoint*, 404 Md. at 477). Attempted second-degree murder does not fall within any of these categories.[12] *First*, attempted murder is not treason, save perhaps for an attempted murder committed with treasonous intent, and there is no suggestion that Mr. Taylor's conviction falls into that extremely narrow sub-set. *Second*, attempted murder is not a common law felony—a category of crimes that includes murder, rape, manslaughter, robbery, sodomy, larceny, arson, mayhem, and burglary—because "at common law, an attempt to commit any crime, whether a felony or misdemeanor, was punishable as a misdemeanor" rather than the felony that attempted second-degree murder is (and was at the time of Mr. Taylor's conviction). *Watson v. State*, 311 Md. 370, 375 (1988). And *finally*, attempted second-degree murder is not a *crimen falsi* crime—a category of crimes including "'perjury, false statement, criminal fraud, embezzlement, [and] false pretense'"—because it is not an "'offense involving some element of deceitfulness, untruthfulness, or falsification bearing on the witness's propensity to testify truthfully.'" *Correll v. State*, 215 Md. App. 483,

---

[12] Mr. Jones initially argues in his brief that "[t]here is no doubt that attempted murder is an infamous crime," yet he backs off this contention in the following paragraph to say that "while attempted murder is not an infamous crime, it does have some probative value for impeachment based on its similarity to the common law felony of murder, which is categorically included in the rule itself."

504 (2013) (quoting *State v. Giddens*, 335 Md. 205, 213 n.5 (1994)), *cert. denied*, 437 Md. 638 (2014).

### 2. A prior conviction for attempted second-degree murder is not relevant to Mr. Taylor's credibility.

Because Mr. Taylor was not convicted of an infamous crime, the next question is whether attempted second-degree murder is a "'crime relevant to the witness's credibility.'" *King*, 407 Md. at 698 (quoting Md. Rule 5-609(a)). This is an issue of first impression in this State.

Although "in 'a purely philosophical sense it can be said, understandably, that all violations of the law, by their very nature, involve some element of dishonesty[,] . . . certain crimes have little or no bearing on credibility and consequently are not admissible for impeachment purposes.'" *Westpoint*, 404 Md. at 483 (quoting *State v. Giddens*, 335 Md. 205, 215 (1994)). Crimes "bear[ing] upon a witness's credibility" are crimes that "tend[] to show that the offender is unworthy of belief," *id.* at 484, and two types of crimes meet this standard: *first*, those crimes "where 'the crime itself, by its elements . . . clearly identif[ies] the prior conduct of the witness that tends to show he is unworthy of belief,'" *Thurman v. State*, 211 Md. App. 455, 464 (2013) (quoting *Westpoint*, 404 Md. at 484), and *second*, those crimes where "the perpetrator 'lives a life of secrecy' and engages in 'dissembling in the course of [the crime], being prepared to say whatever is required by the demands of the moment, whether the truth or a lie.'" *Westpoint*, 404

29

Md. at 484 (internal citations omitted) (quoting *Giddens*, 335 Md. at 217). The crime of attempted second-degree murder[13] fits within neither category.

No Maryland appellate court has addressed whether an attempted second-degree murder conviction has sufficient relevance to a witness's credibility such that it should be admissible for impeachment, but we draw from cases analyzing a similar crime—assault with *intent* to murder. In *Hardy v. State*, 301 Md. 124 (1984), the Court of Appeals explained that "[b]ecause the overt act necessary for an attempt is frequently an assault, the [crimes of attempted murder and assault with intent to murder] have a significant overlap. But the overlap is not complete, because an overt act can qualify as an attempt and yet not rise to the level of an assault." *Id.* at 129. That said, the Court held that "the two [crimes] are almost identical," *id.* at 130 (quoting R. Perkins, *Criminal Law* 578 (2d ed. 1969)):

> [A]n assault with intent to commit a particular crime is, in general, the same as an attempt to commit the crime except for two additional requirements—(1) a greater degree of proximity, and (2) actual present ability to commit a battery (the latter being limited chiefly to states in which this has been added by the statutory definition of assault).

*Id.* For present purposes, the two crimes are the same at their core: both involve a physical act committed with the intent to cause the death of the victim, if perhaps

---

[13] A conviction for attempted murder requires "an attempt, manifested by an overt act, coupled with a specific intent to commit murder, *i.e.*, an attempt with intent to murder." *State v. Earp*, 319 Md. 156, 165 (1990). That crime also requires "some overt act in furtherance of the intent that goes beyond mere preparation." *Id.* at 162.

unsuccessfully, and we see no reason to treat a conviction for these crimes differently in analyzing their relevance to a witness's credibility.

And unlike attempted second-degree murder, Maryland appellate decisions *have* analyzed the relevance of prior convictions for assault with intent to murder. In *State v. Duckett*, 306 Md. 503 (1986), the Court of Appeals held that a conviction for assault and battery was inadmissible for impeachment purposes because "[a]cts of violence . . . generally have little or no direct bearing on honesty or veracity." *Id.* at 512 (quoting *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967)). Later, in *Fulp v. State*, 130 Md. App. 157 (2000), we extended this principle to the crime of assault with intent to murder, despite accepting that "the crime of assault with intent to murder is far more serious than the crime discussed in *Duckett*":

> [T]he fact that an accused has committed [assault with intent to murder] does not tell us anything about the truth telling propensity of the accused. There is simply no relationship between the disposition to commit such a crime and the disposition to be untruthful.
>
> \* \* \*
>
> Many assaults with intent to murder are committed due to inebriation, bad temper, or jealousy—or a combination of all three. Because it cannot be said, as a generalization, that persons who are guilty of the crime of assault with intent to murder are likely to be dishonest, *trial judges should not admit evidence of such convictions for impeachment purposes.*

*Id.* at 167 (emphasis added). In other words, "[t]he impeachment value of the crime of assault with intent to murder is close to zero." *Id.* at 168.

31

We see no principled basis on which to distinguish the holdings in *Hardy* and *Fulp*, and thus no reason not to apply the principle delineated in *Duckett*—that "'[a]cts of violence . . . generally have little or no direct bearing on honesty or veracity,'" 306 Md. at 512 (quoting *Gordon*, 383 F.2d at 940)—to a prior conviction for attempted second-degree murder. We hold, therefore, that a conviction for attempted second-degree murder is not a "crime relevant to the witness's credibility," *King*, 407 Md. at 698, and that the circuit court correctly precluded Mr. Jones from impeaching Mr. Taylor with that conviction. And because attempted second-degree murder is neither an infamous crime nor a crime relevant to credibility, "it is inadmissible and the analysis ends." *Id.* at 699 (quoting *Westpoint*, 404 Md. at 477).

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**