REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 490

September Term, 2015

_____

JOHN W. GREEN, III

v.

STATE OF MARYLAND

_____

Meredith,
Graeff,
Friedman,

JJ.

_____

Opinion by Graeff, J.

_____

Filed:  December 1, 2016

A jury in the Circuit Court for Cecil County convicted appellant, John W. Green, III, of first-degree murder, conspiracy to commit first-degree murder, use of a firearm in the commission of a felony, and unlawfully wearing, carrying or transporting a handgun. The court sentenced appellant to life, all but eighty years suspended, on the murder conviction, thirty years, consecutive, on the conspiracy conviction, and twenty years, consecutive to the murder count, for the convictions of use of a firearm in the commission of a felony and wearing, carrying, or transporting a handgun.

On appeal, appellant presents the following two questions for this Court's review:

1. Did the trial court err in admitting the identification testimony of a key State's witness?

2. Did the trial court err in allowing the State to present evidence during closing argument?

For the reasons set forth below, we answer these questions in the negative, and therefore, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 23, 2013, Jeff Meyers was shot and killed in the driveway of his Cecil County residence while sitting in his pickup truck. During the ensuing seven-day trial against appellant, the State presented numerous witnesses indicating that the shooting was related to stolen money and drugs.

Appellant admitted at trial that he and Jonathan Copeland drove a Ford Mustang to Mr. Meyers' house on Principio Road the day of the murder, where they confronted

Mr. Meyers about the theft of money and drugs belonging to Mr. Copeland.[1] An altercation ensued, and Mr. Meyers was shot and killed.

Thus, it was not disputed that appellant was present at the time of the murder, and that Mr. Copeland, who was taller and skinnier than appellant, was the only other person with appellant at the time of the shooting. The contested issue was the identity of the shooter.[2]

Doris Carter testified that she was driving on Principio Road when she observed a Mustang blocking Mr. Meyers' truck. She observed that the door of the Mustang "was open on the driver's side, and someone was standing there with one foot in the car, one foot out of the car, and there was another person standing off to [her] left." Ms. Carter described the person "standing at the car" as "tall and thin," wearing a black hat "with white design, [which] seemed to be like snowflakes."[3] She described the other person as a

---

[1] Dawn Watson, Meyers' girlfriend, testified that Mr. Copeland was Meyers' heroin dealer, and Mr. Meyers' heroin use had "got[ten] bad."

[2] The State, in its closing rebuttal, argued that the jury "could literally boil this [case] down to two things, the short stocky guy was the one who fired the gun, and [appellant was] the short stocky guy."

[3] Other evidence indicated that appellant was wearing the hat, which subsequently was found in appellant's apartment. Detective Lewis testified that the Statement of Charges reflected that "a witness saw a short, stocky person wearing a snowflake hat shooting into the car." He testified that the witness was Ms. Carter. Julie Kempton, a forensic biologist, testified that two sources of DNA were found on the hat. Appellant was a major contributor to the DNA, and although Ms. Kempton could not identify the minor contributor, she was able to rule out Mr. Copeland. Finally, appellant testified at trial that he was wearing the hat at the time of the shooting.

"short stouter male," who was wearing a "hoodie" and appeared to be a "white male."[4] As she drove past the Mustang, Ms. Carter observed "the short stout person shooting into" Mr. Meyers' truck.[5]

Near the end of the State's direct examination of Ms. Carter, the prosecutor asked her if she could identify the "taller skinnier" man if she saw him. Ms. Carter responded: "I think so." After a lengthy conference with the court and opposing counsel, discussed in more detail, *infra*, the prosecutor brought Mr. Copeland into the courtroom. Ms. Carter then identified Mr. Copeland as the "taller thin" person who was "wearing the hat" and standing next to the black Mustang.

As indicated, appellant was convicted of murder and related crimes. This appeal followed.

## DISCUSSION

## I.

## Identification

Appellant first contends that the circuit court abused its discretion in allowing Ms. Carter to identify Mr. Copeland in court as the "taller thin" man that she saw standing outside the driver's side of the Mustang "wearing the hat." He asserts that, by "failing to provide [him] with complete and accurate information regarding the extent to which

---

[4] Detective Lewis testified that, at booking, appellant's height was 5′6″ and his weight was 190 pounds; Mr. Copeland's height was 5′9″ and his weight was 160 pounds.

[5] Several other witnesses saw a black Mustang and heard gunshots, but they did not witness the actual shooting.

[Ms.] Carter could identify [Mr.] Copeland, both in court and photographically," the State "violated its discovery obligations under Maryland Rule 4-263." He contends that the court should have precluded the identification procedure, and the failure to do so was an abuse of discretion and reversible error.

The State responds in several ways. Initially, it argues that appellant's claim of a discovery violation is unpreserved for this Court's review. Even if preserved, the State contends that there was no violation of the discovery rules, and therefore, appellant's claims are without merit. Finally, the State argues that, even if it did fail to satisfy its discovery obligations, any prejudice to appellant was limited, and cross-examination, not exclusion of the evidence, was the proper remedy.

**A.**

**Discovery Generally**

Maryland Rule 4-263 sets forth the discovery obligations of prosecutors in circuit court criminal trials.[6] The provisions at issue in this appeal are subsections (d)(3), (6), (7), and (9). In this regard, the Rule provides as follows:

> (d) Disclosure by the State's Attorney. Without the necessity of a request, the State's Attorney shall provide to the defense:
>
> > (3) State's Witnesses. As to each State's witness the State's Attorney intends to call to prove the State's case in chief or to rebut alibi testimony: (A) the name of the witness; (B) except as provided under Code, Criminal

---

[6] As the State points out, Rule 4-263 has undergone significant changes over time. We will apply the 2014 version of the rule that was in effect at the time of appellant's trial. *See Riggins v. State*, 223 Md. App. 40, 45 n.1 (2015) ("Md. Rule 4-263(d)(3) was revised after appellant was convicted (effective January 1, 2014) . . . . We shall apply the 2013 version of the rule in effect for appellant's trial.").

-4-

Procedure Article, § 11-205 or Rule 16-910 (b), the address and, if known to the State's Attorney, the telephone number of the witness; and (C) all written statements of the witness that relate to the offense charged;

\* \* \*

(6) Impeachment Information. All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:

\* \* \*

(D) an oral statement of the witness, not otherwise memorialized, that is materially inconsistent with another statement made by the witness or with a statement made by another witness;

\* \* \*

(G) the failure of the witness to identify the defendant or a co-defendant;

(7) Searches, Seizures, Surveillance, and Pretrial Identification. All relevant material or information regarding:

\* \* \*

(B) pretrial identification of the defendant by a State's witness;

\* \* \*

(9) Evidence for Use at Trial. The opportunity to inspect, copy, and photograph all documents, computer-generated evidence as defined in Rule 2-504.3 (a), recordings, photographs, or other tangible things that the State's Attorney intends to use at a hearing or at trial . . . .

In *Williams v. State*, 364 Md. 160, 171 (2001), the Court of Appeals explained that the State's compliance with these rules is not discretionary. The Maryland Rules of Procedure, which have the force of law, "are not mere guides but are 'precise rubrics' to be strictly followed." *Id.* In determining whether a discovery violation has occurred, the courts look first to the plain meaning of the rule. *Id. Accord Johnson v. State*, 360 Md.

250, 264-65 (2000) ("[T]o effectuate the purpose and objectives of the rule, we look to its plain text," and if the words of the rule are unambiguous, "our inquiry ordinarily ceases and we need not venture outside the text of the rule.").

The Court further explained:

> [T]he scope of pretrial disclosure requirements under Maryland Rule 4-263 must be defined in light of the underlying policies of the rule. Inherent benefits of discovery include providing adequate information to both parties to facilitate informed pleas, ensuring thorough and effective cross-examination, and expediting the trial process by diminishing the need for continuances to deal with unfamiliar information presented at trial. Specific to the mandatory disclosure provisions of Rule 4-263(a), the major objectives are to assist defendants in preparing their defense and to protect them from unfair surprise. The duty to disclose pre-trial identifications, then, is properly determined by interpreting the plain meaning of the Rule with proper deference to these policies.

*Id.* at 172 (citations omitted).

## B.

### Proceedings Below

The testimony at issue on appeal occurred on the third day of trial, when the State called Ms. Carter, the only eyewitness to the shooting. After she testified regarding what she saw, including the "tall and thin" person standing by the driver's door of the car and the "short stout person shooting into the truck," the following occurred:

> [PROSECUTOR:] All right. As time has gone by though, as you sit -- again, as you sit here right now, do you have an image of what the taller skinnier one, as you described him, next to the driver's door looked like?
>
> [MS. CARTER:] Yes.
>
> [PROSECUTOR:] And if he was presented to you do you believe that you could identify him?

[MS. CARTER:]  I think so.

[PROSECUTOR:]  Your Honor, can we approach at this time, please?

[DEFENSE COUNSEL:]  I'm going to object.

The court then permitted counsel to approach.  The jury left the courtroom, and the following colloquy ensued:

> [PROSECUTOR:]  Your honor, the state's intention at this time -- and this was the reason for the writ for Mr. Copeland[7] -- noting, of course, that the defendant is not charged merely with first degree murder[], he is also charged with conspiracy to commit first degree murder.  He's charged specifically [with] conspiracy with Mr. Copeland.
>
> It is the state's proffer to the court that we believe that Ms. Carter, upon seeing Mr. Copeland, will be able to positively identify him.  It's very clear that from the case law that presence is not protected as fifth amendment privilege material.  Counsel for Mr. Copeland has already indicated he knows what our intentions are for this morning, and he doesn't believe he has any standing to object.  He's already counseled his client on this.  And based on representations of Mr. Copeland's attorney, Mr. Copeland understands that the state intends to produce the body of Mr. Copeland to at least one witness, and we've chosen Ms. Carter for identification purposes.   I think identification of a co-defendant is -- when charged as coconspirators is almost as important as identification of the defendant within the court process.
>
> * * *
>
> We intend to have Ms. Carter specifically identify -- this is the first prong of this -- identify Mr. Copeland either by face, and say, yes, that's him, or that looks like him or whatever she says, then ask her about the physique, whether that's consistent with the first or the second person or anything to that effect. So that's what we plan to do, and I know counsel has an objection.

---

[7] The day before, the State advised the court that it wanted Mr. Copeland present in court "for identification purposes" by Ms. Carter.  Defense counsel stated: "This is the first time I've heard that this is going to happen."

Defense counsel stated that the State was required to advise prior to trial "that they're going to have a witness who identifies the co-defendant." He then objected to bringing Mr. Copeland into court to stand next to appellant and ask Ms. Carter "are these the same two people," which "essentially [is] an identification of [appellant], which no one said that anyone is going to identify [appellant]." Counsel stated:

> So I think, first of all, there is a discovery problem in that we have no notice that this is going to happen. I mean, that's -- I think that's been basically admitted that he's not even sure if she's going to do it, but clearly they -- someone had some idea that she's going to come in here and say later on that she's come to understand and now she's able to identify him. So there's that issue.
>
> And then to have -- I mean, I understand that you can perhaps have people for builds and such; but that's not what we're doing here. We're doing this to, one, identify Mr. Copeland; two, he intends -- I mean, this is -- I don't think he actually said it, that's what he's going to do.

The court ruled that there would not "be a stand up next to the defendant and have them sized up." It then asked the State why it had not disclosed this information in discovery. The prosecutor replied:

> In terms of discovery the state has to turn over that which the state has, and civilian witness -- more so than police offices [sic] -- civilian witnesses every day get on the stand and say things when they see it for the first time. They say things different and supplemental, additional to what they said during the interview process, and that is part of the pretrial process in terms of the state and the defendant interviewing witnesses and preparing for it, to know these things in advance. . . .
>
> The state has to -- for discovery purposes, the state has to turn over that which the state is in possession of under the rules. Now when there are statements, written statements, recordings, photos lineups, identification processes like that, we're required to turn them over to the defendant. Excuse me.

The reality is, is that Ms. Carter is capable as we hear now from her testimony, of testifying to whether or not she recognizes the defendant or not; and that is not something that in and of itself has to be discovered [sic] to the defendant here. I note that this is co-defendant, not the defendant himself. The rules talked about an identification of the defendant. They don't contemplate the identification of other people at the scene.

The court then asked if Ms. Carter had given a written statement. After confirming that there was a report, and that defense counsel had a copy, the colloquy continued, as follows:

THE COURT: So you have that information?

[DEFENSE COUNSEL:] Yes, your Honor.

THE COURT: Sufficient to cross the witness?

[DEFENSE COUNSEL:] Yes, your Honor.

THE COURT: Assuming on my part that her testimony is that her recollection has changed -- well, you've said sufficient to cross.

[DEFENSE COUNSEL:] I still think an identification of the co-defendant, whenever you get notice of it -- clearly there was some notice. I mean, discovery is an ongoing obligation. That's something that should be given before trial.

THE COURT: What can you cite in support of that?

[DEFENSE COUNSEL:] Well, we filed a discovery motion asking for it, and I -- I mean-- and essentially I would argue that the identification of the co-defendant in this case is -- because he's a co-defendant is essentially identification -- the two go part and parcel on this case.

The prosecutor then stated that the co-defendant, Mr. Copeland, was interviewed and seen by "plenty of other people," and defense counsel knew that "the co-defendant existed. There is no surprise. This is not a surprise witness." He continued:

[T]he only claim of surprise is, is that this witness is going to be able to identify him. But as the court correctly pointed out, which was part of what

the state's argument was going to be, is that the defendant has the opportunity to cross-examine and get out of her the fact that she did not -- she actually went so far as to say that she couldn't identify anybody.

* * *

And so [defense counsel] will be able to adequately cross-examine her and make the appropriate arguments after she identifies, if, in fact, she does identify.

[DEFENSE COUNSEL:] I just note that there's a slight difference between identification of co-defendant by an eyewitness versus just witnesses as to who he is.

[PROSECUTOR:] I think everybody we've listed who's going to identify him is an eyewitness on some level. I don't see the difference.

The court then issued its ruling. It stated that it had "looked again at both the discovery request and the response," and it was going to permit the show up, but control it "very carefully," noting that Mr. Copeland was "not to come within the well of the courtroom. That means he can stand six feet behind you and next to Detective Lewis."

After the jury returned, Mr. Copeland was brought into the courtroom. The following then occurred:

[PROSECUTOR:] Ms. Carter, did you have an opportunity to take a look at the individual that was in this courtroom?

[MS. CARTER:] Yes.

[PROSECUTOR:] Did you recognize him?

[MS. CARTER:] Yes. That was the person that was wearing the hat.

[PROSECUTOR:] Okay. When you say the person that was wearing the hat --

[MS. CARTER:] That was standing outside the car door on the driver's side.

[PROSECUTOR:] Okay.

[PROSECUTOR:]  Just a point of clarification, Ms. Carter.  When you say outside the car door, are you talking about the driver's side of the Mustang?

[MS. CARTER:]  Yes. The door was open, and he was standing inside -- with the door open but inside the door, one foot in the car, one foot out of the car.

[PROSECUTOR:]  Okay. And as you previously testified about a taller skinnier one and a shorter stockier one . . . which of the two --

[MS. CARTER:]  That's the taller thin one.

On cross-examination, defense counsel questioned Ms. Carter about her discussions with the police "closer to when [the incident] happened."  She denied telling the detectives two days after the incident that the person with the snowflake hat shot into the car.  She agreed that she told the detectives, approximately a week later, that she did not get a very good look at the people as she drove by because she was worried about their vehicle in the road.  She was unable to give any further description of the people involved, other than that there were two men, one who was short and stocky, and the other tall and thin, and that one was wearing a hat.  She noted, however, that "memories start coming back after I talked to them, and I didn't talk to them until now.  I'm just telling you what I saw that day and what I remember I saw that day."

With respect to her identification in court of Mr. Copeland, counsel asked if she had "ever been shown a photo of him before."  The following then occurred:

[MS. CARTER:]  I just identified him through just like his eyes and the hat, and not because of, you know, what he was wearing today or anything like that.  I remember he looked at me and I looked at him as I was going by because he was right there.

[DEFENSE COUNSEL:] Have you seen his picture in the newspaper or anywhere since this happened?

[MS. CARTER:] Yes, yes, in the Cecil Daily.

[DEFENSE COUNSEL:] Oh.

[MS. CARTER:] But I knew when [I] saw that, that was the person driving the car -- or standing outside that driver's door. The other person I'd saw in the paper also, and I didn't know them at all.

[DEFENSE COUNSEL:] When you -- since -- when was the first time that you realized, seeing a picture, that you knew who that person was?

[MS. CARTER:] When I saw it probably in the paper. I said, oh, wow, that's the guy that was wearing the hat, that's the guy that was standing outside the door.

[DEFENSE COUNSEL:] So like a year ago?

[MS. CARTER:] . . . I'm not sure when they put it in the paper.

[DEFENSE COUNSEL:] But sometime after this case and people were charged --

[MS. CARTER:] Yes.

Ms. Carter testified that she did not call anyone to tell the detectives that she had seen the newspaper photo of one of the men involved, noting that she "didn't want to be here today." She told the detectives that she knew who Mr. Copeland was when she "went over . . . everything again with them, what I saw -- everything that I saw that day."

## C.

### Preservation

The State contends that, for two reasons, appellant failed to preserve his discovery violation claims for this Court's review. First, it asserts that, pursuant to Maryland Rule 4-323(a), a party must object to the admission of evidence "at the time the evidence is

-12-

offered or as soon thereafter" for the claim to be preserved, and it argues that, although appellant "objected earlier on discovery grounds . . . , he did not object at the time [Ms. Carter] testified about her identification." The State analogizes appellant's objection to a motion *in limine*, arguing that, when the court denies such a motion to exclude evidence, a party can challenge this ruling on appeal only if he or she makes a contemporaneous objection at trial when the evidence actually is introduced. Because appellant did not do so in this case, and he did not "ask for, or receive, a continuing objection regarding [Ms.] Carter's identification testimony," the State argues that this issue is not preserved for this Court's review.

Second, the State contends that appellant's objection below was based only on the argument that the State was required to disclose in discovery an identification of the defendant, which encompassed Ms. Carter's identification of Mr. Copeland as a co-defendant. It asserts that the argument on appeal, to the extent that it encompasses additional contentions, is not preserved for this Court's review.

Several rules are relevant to the State's preservation arguments. Initially it is well-established that Maryland's appellate courts ordinarily will not consider "any issue 'unless it plainly appears by the record to have been raised in or decided by the trial court.'" *King v. State*, 434 Md. 472, 479 (2013) (quoting Md. Rule 8-131(a)). Moreover, pursuant to Maryland Rule 4-323(a), "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent."

Here, we are not persuaded by the State's first argument, that defense counsel failed to preserve the argument that a discovery violation barred evidence of Ms. Carter's identification given the failure to object to Ms. Carter's ultimate testimony identifying Mr. Copeland. The Maryland appellate courts have addressed, and rejected, similar arguments, particularly where the testimony is admitted minutes after a motion in limine ruling. *See Norton v. State*, 217 Md. App. 388, 396-97 (2014) (After denial of motion in limine to exclude evidence, requiring a defendant to "make 'yet another objection only a short time after the court's ruling to admit the evidence would be to exalt form over substance.'") (quoting *Clemons v. State*, 392 Md. 339, 363 (2006)), *aff'd on other grounds*, 443 Md. 517 (2015). *See also Dyce v. State*, 85 Md. App. 193, 198 (1990) ("Given the temporal proximity between the ruling on the motion *in limine* and the prosecutor's initial inquiry on cross-examination we shall exercise our discretion under Md. Rule 8-131 and consider the issue, notwithstanding the lack of literal compliance with Rule 4-323(a).").

Here, when the State, during its direct examination of Ms. Carter, stated that it intended to have Ms. Carter attempt to identify Mr. Copeland in court, defense counsel objected. The court considered the parties' arguments, and it permitted the State to proceed. Although defense counsel did not object when the State, immediately thereafter, had Mr. Copeland brought into the courtroom and asked Ms. Carter if she recognized him, we conclude that this issue was sufficiently preserved for this Court's review.

The State's second preservation argument, however, has merit. Appellant's argument below did not specifically mention Rule 4-263, and in no way can it be construed

as arguing a violation of Rule 4-263(d)(3), (6), or (9). Appellant's argument regarding a discovery violation was limited to the argument that the State was obligated to disclose the identification of a co-defendant, particularly when it "essentially" was an identification of appellant in this case. Under these circumstances, we agree with the State that appellant's additional claims on appeal are not preserved for this Court's review. Accordingly, we will limit our analysis to the issue raised below, and we will not consider the contentions that the State's failure to disclose Ms. Carter's identification violated discovery obligations pursuant to Rule 4-263(d)(3) (requiring disclosure of "each State's witness [the prosecution] intends to call" to prove its case); (d)(6) (requiring disclosure of information "that tends to impeach a State's witness"); and (d)(9) (allowing inspection of "photographs, or other tangible things"). Without in any way suggesting that there was a violation of Rule 4-263(d)(3), (6), or (9), our review will be limited to whether the circuit court erred in allowing the identification procedure due to a violation of the State's discovery obligations pursuant to Rule 4-263(d)(7) (regarding disclosure of a "pretrial identification of the defendant by a State's witness.").

**D.**

**Standard of Review**

In addressing a claim that the circuit court erred in admitting evidence based on a discovery violation, the standard of review by the appellate court depends on the rationale of the circuit court. If the circuit court finds that there was a discovery violation, but it determines that exclusion of the evidence is not the appropriate sanction, we review that

-15-

decision for an abuse of discretion. *See Williams*, 364 Md. at 178 ("The remedy . . . for a violation of the discovery rule is, in the first instance, within the sound discretion of the trial judge. . . . Generally, unless we find that the lower court abused its discretion, we will not reverse."). Where, however, as in this case, the court does not make a specific finding regarding whether there was a discovery violation, "we exercise independent de novo review to determine whether a discovery violation occurred." *Id.* at 169.[8] If we determine that the State did violate a discovery rule, we consider whether the admission of the evidence was harmless error. *Id.*

## E.

## Discovery Regarding Pretrial Identification of the Defendant

Appellant contends that the State violated Rule 4-263(d)(7), which requires the State, "[w]ithout the necessity of a request," to provide to the defense: "All relevant material or information regarding: . . . (B) pretrial identification of the defendant by a State's witness." He asserts that the State failed to disclose that, after Ms. Carter's "initial vague description of the two men at the scene of the shooting, she positively identified

---

[8] The circuit court here did not make a specific finding regarding whether the State committed a discovery violation. Rather, the court considered the parties' arguments, reviewed appellant's discovery request and the State's response, and simply stated that it was "going to permit the show up." Under the circumstances, we review this case as one in which the trial court ruled that there was no discovery violation that precluded the State from conducting the show up and eliciting testimony regarding the identification of the co-defendant.

Copeland in a photograph and advised police that she was able to positively identify Copeland."[9]

Appellant relies on *Williams*, 364 Md. at 166, in which the State advised in discovery that a police officer conducting surveillance could testify only "to the general description of a man who entered the surveilled premises." At trial, however, the officer specifically identified the defendant as the person who entered the premises. *Id.* at 168. The Court of Appeals held that "the State's failure to provide Williams with complete and accurate information regarding the extent to which Trooper Wilson, a witness closely identified with the State, could identify Williams" was a violation of the discovery rule requiring disclosure of pretrial identifications of the defendant. *Id.* at 178.

*Williams*, however, is readily distinguishable. The identification in *Williams* was deemed to fall within the ambit of Rule 4-263(d)(7) because it involved an identification of the defendant. Here, however, Mr. Copeland was not the defendant on trial.

---

[9] The State disputes that it knew pretrial that Ms. Carter could identify Mr. Copeland, and there were no factual findings in this regard by the circuit court. We note, however, that the State clearly had some reason to believe at trial that Ms. Carter could give some form of identification of Mr. Copeland. It proffered that it believed that Ms. Carter "will be able to positively identify" Mr. Copeland, although it subsequently stated that its intent was to have Ms. Carter "identify Mr. Copeland either by face, and say, yes, that's him, or that looks like him or whatever she says, then ask her about the physique, whether that's consistent with the first or the second person or anything to that effect." Moreover, in responding to the court's question why the State had not disclosed that Ms. Carter could identify Mr. Copeland in some way, the prosecutor stated that the rules required that the State disclose the identification of a defendant, not a co-defendant or other people at the scene.

Appellant acknowledges this distinction between the cases, but he argues that it "is a distinction without a difference," for either of two reasons. First, he asserts that, although Rule 4-263(d)(7)(B) refers only to identifications of the defendant, reading the rule "in light of the policies underlying the State's discovery obligations, in particular the policy . . . of assisting 'defendants in preparing their defense and to protect them from unfair surprise'" "compels the conclusion" that the Rule includes pretrial identifications "of a defendant and a co-defendant." Second, he asserts that, even if the Rule is read to apply only to information regarding identifications of the defendant, it was applicable here under the specific facts in this case. In that regard, he asserts that, where the only issue was the identity of the shooter, Ms. Carter's identification of Mr. Copeland as the tall, thin man necessarily implied the identification of appellant, the defendant, as the shooter.

We address first appellant's contention that Rule 4-263(d)(7)(B) requires disclosure of a pretrial identification of, not only a defendant, but also a co-defendant. We begin, as we must, with the language of the rule. *See Johnson*, 360 Md. at 264-65 ("[T]o effectuate the purpose and objectives of the rule, we look to its plain text," and if the words of the rule are unambiguous, "our inquiry ordinarily ceases and we need not venture outside the text of the rule.").

As indicated, Rule 4-263(d)(7)(B) requires disclosure of "relevant or material information regarding . . . pretrial identification of **the defendant** by a state's witness." (emphasis added). This language is plain and unambiguous. It does not include a co-defendant, or even "a" defendant, but rather, it requires disclosure of pretrial identifications

-18-

of "the defendant." Given this plain and unambiguous language, we hold that the term "defendant" does not include co-defendants.

Indeed, as the State points out, where the intent of Rule 4-263(d) was to require disclosure of information regarding co-defendants, as well as defendants, the term co-defendant was specifically used. *See* Md. Rule 4-263(d)(6)(G) (requiring the State to disclose impeachment information, including: "[T]he failure of the witness to identify the defendant or a co-defendant."). *See also Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 351 (2012) ("To determine the plain meaning of language, we consider the statutory scheme in which the particular provision or provisions appear."). The requirement in Rule 4-263(d)(7)(B) that the State disclose information regarding a pretrial identification of the defendant does not encompass identifications of co-defendants or other participants in the crime.

We turn next to appellant's argument that Ms. Carter's pretrial identification of Mr. Copeland constituted the "identification of the defendant" because, under the facts of this case, it "necessarily implied the identification of [him] as the shooter." Appellant explains his contention in this regard as follows:

> Critical to [appellant's defense that he was present when Mr. Meyers was shot, but Mr. Copeland was the shooter] was that the only eyewitness to the shooting, Carter, was vague in describing the two men she saw at the scene of the shooting, acknowledging that she did not get a good look at [them], that she initially could not give much more by way of description than what she had testified to - tall and skinny versus short and stocky, one wearing a hat, the other a hoodie, and admitting, e.g., that she could not describe any facial features or facial hair. Moreover, while Carter insisted, contrary to Detective Sewell's testimony, that she never saw the shooter with the

snowflake hat, this insistence is contrary to all of the evidence putting Appellant in possession of that hat.

The weakness of Carter's account, absent the positive identification of Copeland, created an opening for Appellant to argue that she was mistaken about which of the two people was the shooter. The obvious purpose behind the State's orchestrating the in-court identification was to shore-up Carter's identification of Appellant as the shooter, via positive identification of Copeland as the non-shooter, and thereby eliminate this opening for the defense.

Appellant relies on this Court's statement in *Simons v. State*, 159 Md. App. 562, 575 (2004), in which this Court held that, "when the pretrial statement of an eyewitness directly implicates the defendant in the commission of the crime," it constitutes a pretrial identification in the context of the discovery rules. He asserts that Ms. Carter's identification of Mr. Copeland "implicated" him in the murder and made the identification discoverable.

Appellant's reliance on *Simons* is misplaced. In that case, this Court addressed, as the Court of Appeals did in *Williams*, a statement of identification of the defendant. Specifically, the issue in *Simons* was "whether a witness's testimony placing a defendant, previously known to the witness, at the scene of the crime constitutes an identification under [the] discovery rules." *Id.* at 578 n.1.

Appellant cites no persuasive authority supporting his argument that an identification of someone other than the defendant falls within the scope of Rule 4-263(d)(7)(B) in the circumstance where it suggests, in conjunction with other evidence, that the defendant was involved with the crime. If the rule were construed in this regard, how would the State know what was required to be disclosed? Here, the reason why

Ms. Carter's identification permitted the inference that appellant was the shooter was appellant's trial strategy; he testified at trial that he was one of the two men that witnesses saw at the crime scene, and Ms. Carter's identification ruled out the other person. The State's pretrial discovery obligations cannot be dependent on the defense trial strategy, which often will be unknown prior to trial.

We hold that the State's discovery obligations pursuant to Rule 4-263(d)(7) are limited to that set forth by the plain language of the rule, i.e., information regarding "pretrial identification of the defendant by a State's witness." Because Ms. Carter's identification of Mr. Copeland was of someone other than the defendant, the State did not violate this rule in failing to give the defense information that Ms. Carter previously had recognized Mr. Copeland's picture in the newspaper and could (or might) identify Mr. Copeland in court. Accordingly, the circuit court did not err in admitting Ms. Carter's identification of Mr. Copeland at trial.

## II.

### Closing Argument

Appellant next contends that the circuit court "erred in allowing the State to present evidence during closing argument." Specifically, he asserts that, during "rebuttal closing argument, over objection, the State replayed portions of recorded telephone discussions between [a]ppellant and [Mr.] Copeland." Appellant contends that allowing the State to replay the recordings when they were not introduced into evidence "was analogous to permitting the introduction of evidence out of order," which was an abuse of discretion.

-21-

The State contends that the circuit court properly exercised its discretion in allowing the prosecutor to replay recordings that had been played during trial for the jury, but were not admitted as exhibits. It contends that appellant's analogy to "permitting the introduction of evidence out of order" is inapposite because the recordings at issue here, although not admitted as exhibits, were in evidence after they were played for the jury.

## A.

### Proceedings Below

Shortly before closing argument, defense counsel objected to the prosecutor playing the recordings of the jail house conversations between appellant and Mr. Copeland. Counsel stated:

> What was said is evidence, but the State did not offer the CDs into evidence, the actual media. They played certain portions. There's nothing on the record that indicates specifically what they played, like time to time, just certain things are played, and they are going to randomly pick things. Quite frankly, those CDs aren't in evidence. I would argue that what's in evidence, it's the testimony through those tapes. He can argue that. I'm not arguing that it's not in evidence what they heard on there. They have heard it. But the actual media, if he's going to that media and play it again, they aren't in evidence. Frankly, there's nothing in evidence specifying which parts were played and I think it should be the jury should rely on their memory as to what the evidence is. I mean, I guess we could -- I mean, he could theoretically get a transcript and just read it back. That might be the solution for him. Or he can argue it. But those CDs are not in evidence and I don't think he should be allowed to play that for the jury.

The prosecutor argued that the recording that he planned to replay during closing argument was "in evidence and available for consideration." He stated as follows:

> The fact that counsel says that we could get transcripts and replay it means that he's acknowledging that it is something that the jury can consider, which means that it is in evidence. . . . Something that's in evidence in a formal

-22-

sense as to what they can take back into the jury room is what he's referring to and he is then conveying that into the other sense of what's in evidence. What's in evidence is anything that they can consider. If they can consider it, if they have heard it, if they have seen it, and in this case they have heard it and they have seen it, then they are allowed to consider it and I am allowed to refer to it. The fact that I am allowed to refer to it, and by his own words, [defense counsel's] own words, that I could even in his eyes potentially read from a transcript is drawing attention to it yet again. That's no different than me playing it again. There's absolutely no difference between them hearing it from a recorded device versus hearing it from some type of transcription device. The only fundamental difference here is, and it's done for procedural purposes only, not substantive, procedural purposes only, is that those discs for reasons that everybody in this courtroom knows cannot go back into the jury room. It doesn't mean they can't consider it. It is fair game. I have every intention of referring to those quotes. [10]

After considering further argument, the court overruled defense counsel's objection.

It stated:

The words are in. Whether they came out of the mouth of one of, well, not one of the attorneys, but one of the witnesses or off of a screen, those words are in. They can't be taken back. They can be replayed. What I don't want, Mr. [Prosecutor], is them played, those snippets or whatever you want to call them, played repeatedly. One shot at them. I think that's appropriate.

---

[10] Although the prosecutor did not elaborate on the reasons at that point, the State indicated at an earlier bench conference that it had only a copy of the entire jail call recording, and it did not have the "technology to isolate" the portions of the audio recordings that the State wanted the jury to hear from the remainder of the recorded conversations. Thus, it played a portion of the recordings for the jury, stating: "They will be marked for identification purposes only. They will not go into evidence so that [the jury] cannot take it back into the jury room and hear the parts that are not played."

The State offered to provide transcripts of the audio conversations that were prepared by the Sheriff's Office. Defense counsel objected, arguing that "it's the jury's job to interpret what is said on the tape, not the sheriff's office's." The court sustained the objection, barring the State from publishing the transcripts to the jury or admitting them into evidence. *Cf. Marshall v. State*, 174 Md. App. 572, 575-80 (2007) (court did not abuse discretion in admitting transcript of recording prepared by the Detective assigned to the case, where the court instructed the jury that the transcript was only an aid to assist the jury, but the jury was required to determine the content of the recording).

-23-

[PROSECUTOR:] Understood.

## B.

## Closing Argument

Before specifically addressing appellant's claim of error, we will briefly discuss the scope of permissible closing argument and the limits thereon. The Maryland appellate courts have made clear that an attorney has "'great leeway in presenting closing arguments to the jury.'" *State v. Newton*, ___ Md. App. ___, No. 1751, Sept. Term, 2015, slip op. at 10 (filed Sept. 30, 2016) (quoting *Pickett v. State*, 222 Md. App. 322, 329 (2015)). *Accord Degren v. State*, 352 Md. 400, 429 (1999). We have explained:

> [I]t is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way.

*Sivells v. State*, 196 Md. App. 254, 270 (2010) (quoting *Mitchell v. State*, 408 Md. 368, 380 (2009)), *cert. dis'd as improv. granted*, 421 Md. 659 (2011).

The determination whether counsel's comments in closing were improper and prejudicial is a matter within the discretion of the trial court. *Sivells*, 196 Md. App. at 271. "An appellate court generally will not reverse the trial court 'unless that court clearly abused the exercise of its discretion and prejudiced the accused.'" *Id.* (quoting *Degren*, 352 Md. at 431.

Turning to the specific issue raised here, appellant has not cited, and this Court has not found, any Maryland opinion addressing whether it is an abuse of discretion for a court

to allow a party to replay during closing argument a recording played to the jury during trial. Other courts, however, have addressed the issue and held that it is within the trial court's discretion to permit a party, during closing argument, to replay recordings.

In *Hodges v. State*, 392 S.E.2d 262, 263 (Ga. Ct. App. 1990), the Court of Appeals of Georgia stated:

> The replay of a portion of the videotape is not a recall of a witness, but rather the verbatim repetition of testimony already in evidence. "Since counsel in argument clearly have the right to comment on the evidence, it is not improper for them to repeat what testimony was, to read from documents which have been admitted in evidence, or to read from admitted transcripts of recordings played for the jury." *Ramsey v. State*, 165 Ga. App. 854, 859, 303 S.E.2d 32 (1983). As the videotape statement had been admitted into evidence, we find no abuse of the trial court's discretion in allowing counsel to replay the tape rather than having a transcript prepared and read.

The Supreme Court of Georgia subsequently agreed with this analysis, holding that counsel in closing may "properly replay a portion of a videotape admitted into evidence as it is simply the verbatim repetition of testimony already in evidence." *Brown v. State*, 490 S.E.2d 75, 82 (Ga. 1997).

Other jurisdictions similarly agree. *See, e.g.*, *United States v. Muhlenbruch*, 634 F.3d 987, 1001 (8th Cir. 2011) (court did not abuse its discretion in permitting the government to play the videotape during closing arguments); *People v. Gross*, 637 N.E.2d 789, 791-92 (Ill. App. Ct. 1994) ("[N]o abuse of discretion in the decision to allow the replay of limited excerpts of videotaped evidence for the purpose of summary during closing argument."); *State v. Bonanno*, 373 So. 2d 1284, 1292 (La. 1979) ("Because the tape recorded statements were properly admitted into evidence at trial, the court did not err

in allowing the state to replay the tapes during its closing argument."); *State v. Marinez*, 781 N.W.2d 511, 519 (Wis. Ct. App. 2010) (determination whether to allow video statements during closing argument is a matter within the court's discretion).

Defense counsel below recognized that the prosecutor could have read from a transcript of the recordings below. This is consistent with Maryland law that "the trial judge ha[s] discretion to permit counsel in closing argument to read from portions of the trial transcript." *Jackson v. State*, 164 Md. App. 679, 727 (2005), *cert. denied*, 390 Md. 501 (2006). *Accord Yuen v. State*, 43 Md. App. 109, 118 (1979).

Courts in other jurisdictions have recognized that, because playing a recording during closing argument is analogous to reading from a transcript, it is not an abuse of discretion to allow a party to replay a recording during closing argument. *United States v. Guess*, 745 F.2d 1286, 1288 (9th Cir. 1984) ("[T]he use of tape recordings in oral argument falls within the discretion of the trial judge as does the use of exhibits or trial testimony transcripts."), *cert. denied*, 469 U.S. 1225 (1985); *Fields v. Commonwealth*, 12 S.W.3d 275, 281-82 (Ky. 2000) ("As for closing argument, attorneys are generally allowed to replay excerpts from recorded testimony, which is analogous to reading excerpts from the record."). We agree with this analysis and hold that the trial court has discretion to allow a party, during closing argument, to replay portions of a recording admitted into evidence.

Appellant contends that the court in this case abused its discretion in allowing the State to replay the recordings in closing argument because, although the recordings were played for the jury, they were not physically admitted into evidence. He asserts that this

"was analogous to permitting the introduction of evidence out of order." We are not persuaded.

As the circuit court noted, although the recordings themselves were not in evidence, "the words [were] in." Because a party is entitled during closing argument to discuss the evidence, counsel may repeat the testimony by replaying the recording that the jury already heard in evidence, similar to reading a transcript of testimony. Accordingly, it was not an abuse of discretion by the circuit court to permit the prosecutor to utilize the previously played recording in closing argument.

**JUDGMENTS OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**